UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Marshall Austin, | ) | |
| | ) | Case No.: <u>2:23-cv-2899-RMG</u> |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| | ) | |
| Charleston Day School ("CDS"); Emmie | ) | |
| G. Hershey; Judith Foley Arnstein. | ) | |
| | ) | |

NOW COMES PLAINTIFF, Marshall Austin, by and through his attorneys to recover losses that Plaintiff sustained as a result of Defendants' retaliatory actions.

## I. INTRODUCTION

1.      This action is brought under the False Claims Act, 31 U.S.C. § 3730(h) ("FCA"), seeking damages for Defendants' retaliatory actions against Plaintiff and his family after he engaged in protected activity by attempting to ascertain the scope of—and curtail—Charleston Day School's ("CDS") misappropriation and misuse of federal funds.

2.      Like many schools, CDS applied for federal financial assistance during the COVID-19 pandemic.

3.      CDS received funds under both the Emergency Assistance to Non-Public Schools ("EANS") and Paycheck Protection Program ("PPP") (collectively, "Federal COVID Funds"), which collectively amounted to more than $600,000.

4.      A short time after CDS applied for and obtained these funds, Plaintiff was elected to CDS's Board of Trustees in June 2021.

5.      Plaintiff soon began receiving complaints from CDS parents who were concerned about CDS's leadership, CDS's response to the pandemic, CDS's receipt and use of Federal COVID Funds, and potential self-dealing by individuals on CDS' Board of Trustees.

6.      On October 12, 2021, CDS's Board of Trustees voted to transfer the school's surplus from the previous year, which totaled more than $700,000, to CDS's endowment.

7.      Upon information and belief, this transfer included Federal COVID Funds.

8.      On October 15, 2021, the Investment Oversight Committee of the CDS Board of Trustees (the "Investment Oversight Committee") determined the surplus funds moved to the endowment would be invested over a three-month period with the final investment to be made in December 2021.

9.      In December 2021, Plaintiff learned that his access to the minutes from prior Board of Trustees' meetings and related documents had been cut off by Defendant Emmie G. Hershey.

10.      Upon information and belief, on December 16, 2021, the Investment Oversight Committee completed the final trade of the surplus funds referenced in paragraphs 6 through 8.

11.      As the complaints about CDS's response to the pandemic continued to roll in, Plaintiff—a former federal prosecutor—began to investigate CDS's acquisition and use of Federal COVID Funds.

12.      Plaintiff learned of several irregularities, including potential misrepresentations on CDS's EANS application and misuse of PPP funds.

13.      On January 24, 2022, in an effort to stop this potential fraud, Plaintiff raised concerns about CDS's eligibility for, and use of, Federal COVID Funds to CDS Trustee Jamie Hood.

14.      Similarly, on January 25, 2022, Plaintiff's wife—Francie Austin—raised these issues with CDS's attorney, Cherie Blackburn.

15.     On several occasions at the end of January 2022 and into February 2022, Plaintiff offered to initiate and oversee an audit of CDS's acquisition and use of Federal COVID Funds.

16.     On January 26, 2022, Plaintiff raised the same issues previously raised by his wife with CDS's attorney Cherie Blackburn ("Attorney Blackburn") on a telephone call.

17.     During this call, Attorney Blackburn advised that there was no legitimate basis for denying Plaintiff access to the CDS Board of Trustees' minutes or related documents.

18.     On February 3, 2022, Defendant Hershey emailed Plaintiff and stated that his request to access the minutes and related documents was "a very unusual request."

19.     Defendant Hershey stated that she "need[ed] to find out what the correct protocol is."

20.     Plaintiff responded:

What is unusual about the request? I'm a member of the board. I've confirmed with [Attorney Blackburn] that there is no basis for denying members access to meeting minutes. It's not part of the Chair's duties to say who does/doesn't have access to them. Nor does that fall within the executive committee's authority. I wouldn't have to ask for them if you hadn't decided to take them down from the website.

21.     Defendants continuously resisted Plaintiff's good-faith efforts to stop CDS's improper acquisition and use of Federal COVID Funds.

22.     Later, on February 3, 2022, Plaintiff learned from Trustee Jamie Hood that CDS had retained a new attorney—Alice Paylor ("Attorney Paylor")—and planned to call a Special Board Meeting ("Special Meeting") to ensure that Plaintiff's children would not be able to re-enroll at CDS.

23.     On February 5, 2022, Plaintiff brought his concerns about CDS's acquisition and use of Federal COVID Funds to an Assistant United States Attorney ("AUSA") for the District of South Carolina.

24.     Several hours later, Plaintiff informed Attorney Paylor about his conversation with the AUSA.

25.     At approximately 9:30 PM the following night (February 6, 2022), CDS sent a man purporting to be a process server to Plaintiff's home.

26.     The man delivered a letter calling for the Special Meeting on February 11, 2022, and a packet of materials including correspondence between Plaintiff, his wife, and CDS employees and Trustees.

27.     The letter stated that the Special Meeting was being convened to address "Re-enrollment Contracts for 2022–2023 and Trustee Update."

28.     On February 11, 2022, CDS held the Special Meeting via zoom.

29.     Without prior notice and in contravention of CDS' Bylaws,[1] Defendant Hershey immediately moved on behalf of the Executive Committee for the Board of Trustees to enter Executive Session to consider the first agenda item: Removing Plaintiff from CDS' Board of Trustees.

30.     Defendant Hershey explained to the rest of the Trustees that the "motion came from Committee" and thus needed no second.

31.     Defendant Hershey then cut off Plaintiff's Zoom access for over an hour and a half while the Trustees discussed the motion.

32.     After the conclusion of the discussion, Plaintiff was allowed to rejoin the Zoom call and, despite not being privy to Trustees' internal discussions, was given just five minutes to respond.

---

[1] Section 16.1 of the CDS Bylaws states: "Any officer or Trustee of the Corporation may at any time be removed by a two-thirds (2/3) vote of the entire membership of the Board of Trustees, at a specially called meeting of the Board of Trustees held after five (5) days prior notice thereof."

33.    On the motion of Defendant Hershey, Plaintiff was removed from CDS's Board of Trustees.

34.    The remaining Trustees then voted not to renew the contracts of Plaintiff's three children for the 2022–23 school year.

35.    Several days later, Defendant Hershey emailed the CDS community to inform them that the Board of Trustees' votes were "taken following a series of actions that were in conflict with our expectations for Trustees as fiduciaries of the School and our parent partnership expectations as outlined in the School's Enrollment Contract."

36.    Upon information and belief, over the next few months, Defendant CDS, Defendant Judith Foley Arnstein, and others actively interfered with Plaintiff's ability to find another suitable school for his children.

## II. JURISDICTION AND VENUE

37.    Plaintiff re-alleges and incorporate the allegations of the paragraphs above as if fully set forth herein.

38.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

39.    At all times material to this Complaint, Defendants regularly conducted substantial business within the State of South Carolina and maintained permanent employees and offices in South Carolina.

40.    Defendants are thus subject to personal jurisdiction in South Carolina.

41.    Venue lies in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because one or more Defendants reside in and/or has transacted business within this Court's jurisdiction, and the acts set out herein occurred in this district.

42.     Venue lies in the Charleston Division because one or more of the Defendants reside in and/or has transacted business within this Court's jurisdiction, and the acts set out herein occurred in this division.

### III. PARTIES

43.     Plaintiff re-alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

### A.  Plaintiff Marshall Austin

44.     Plaintiff is a resident and citizen of Charleston County, South Carolina.

45.     Plaintiff and his wife have two biological children—John Doe 1 (age 11) and John Doe 2 (age 9).

46.     Plaintiff and his wife are also the primary caregivers for their niece and nephew—John Doe 3 (age 17) and Jane Doe 1 (age 14).

47.     Plaintiff's father-in-law has custody of John Doe 3 and Jane Doe 1; however, Plaintiff and his wife are the primary caregivers and Attorneys-in-Fact for John Doe 3 and Jane Doe 1's education-related activities.

48.     At all times relevant to this Complaint, John Doe 1, John Doe 2, and Jane Doe 1 were students at CDS.

49.     Plaintiff is an attorney and former Assistant United States Attorney ("AUSA") for the District of South Carolina.

50.     During his time as an AUSA, Plaintiff investigated PPP fraud and also prosecuted a case in conjunction with the Department of Education, Office of Inspector General.

51.     Plaintiff was a member of CDS's Board of Trustees from June 2021 to February 11, 2022.

52.     Plaintiff was an agent of CDS during his tenure on the Board of Trustees.

**B. Defendant Charleston Day School**

53.     CDS is a private educational institution that has been in operation since 1937.

54.     CDS "is a nonprofit educational organization incorporated under the South Carolina Nonprofit Corporation Act of 1994 . . . and formed and operated solely for educational, scientific, literary, and charitable purposes under Section 501(c)(3) of the Internal Revenue Code . . . ." (CDS Bylaws Art. I, Section 1.1).

55.     CDS is located in Charleston County, South Carolina.

56.     CDS's "Mission" is "to foster scholarship, integrity, respect and responsibility in [their] students."

57.     CDS's "Vision" is to "partner[] with families to provide a superior academic, artistic, athletic and ethical foundation, preparing each student for a lifetime of achievement."

58.     CDS is comprised of three divisions: **(1)** Kindergarten; **(2)** Lower School (Grades 1–5); and **(3)** Middle School (Grades 6–8).

59.     CDS's annual tuition for the 2022–23 year is $19,900 for Kindergarten and $25,800 for Lower School and Middle School.

60.     CDS's Bylaws vest "direction and control" of the school in a Board of Trustees. (CDS Bylaws, Art. III, Section 3.1).

61.     CDS's "Board of Trustees may exercise all such powers of [CDS] and do all such lawful acts and things as are not proscribed by statute, by the articles of incorporation, or by the[] By-Laws." (CDS Bylaws, Art. III, Section 3.2).

62.     CDS's Board of Trustees has an Executive Committee, which "consist[s] of the Chair, Vice-Chair, Treasurer, Secretary and the immediate past Chair, if she or he is a member of the Board." (CDS Bylaws, Art. IX, Section 9.1).

63.     A Trustee can be "removed by a two-thirds (2/3) vote of the entire membership of the Board of Trustees, at a specially called meeting of the Board of Trustees held after five (5) days prior notice thereof." (CDS Bylaws, Art. XVI, Section 16.1).

### C.  Defendant Emmie G. Hershey

64.     Defendant Emmie G. Hershey is, upon information and belief, a citizen and resident of Charleston, South Carolina.

65.     Defendant Hershey is a member of CDS's Board of Trustees.

66.     At all times relevant to this Complaint, Defendant Hershey was the Chair of CDS's Board of Trustees.

67.     At all times relevant to this Complaint, Defendant Hershey was a member of CDS's Executive Committee.

### D.  Defendant Judith Foley Arnstein

68.     Defendant Judith Foley Arnstein is, upon information and belief, a citizen and resident of Charleston, South Carolina.

69.     At all times relevant to this Complaint, Defendant Arnstein was an *ex-officio* member of CDS's Board of Trustees.

70.     At all times relevant to this Complaint, Defendant Arnstein was CDS's Head of School.

## IV.     GOVERNING LAW

71.     Plaintiff re-alleges and incorporates the allegations of the paragraphs above as if

fully set forth herein.

72.     The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States government. 31 U.S.C. § 3729(a)(1).

73.     The FCA provides, in pertinent part, that a person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (a)(1)(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
>
> . . .
>
> (a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990[2] (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

74.     For purposes of the FCA,

> the term "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the

---

[2] By virtue of 28 C.F.R. § 85.3(a)(9), the penalty range for violations occurring on or before November 2, 2015, has increased to a minimum of $5,500 and a maximum of $11,000 per violation. The penalties have continually been adjusted for inflation, and the minimum penalty is currently $11,665 and the maximum penalty is $23,331 per violation. *See* 85 Fed. Reg. 37004.

information; or (3) acts in reckless disregard of the truth or falsity of
the information; and require no proof of specific intent to defraud.

32 U.S.C. § 3729(b)(1).

75.     Under the FCA, the term "material" "means having a natural tendency to influence,
or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

76.     The FCA also contains an anti-retaliation provision, which states: "Any employee,
contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or
agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened,
harassed, or in any other manner discriminated against in the terms and conditions of employment
because of lawful acts done by the employee, contractor, agent, or associated others in furtherance
of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31
U.S.C. § 3730(h)(1).

## V.     FACTUAL ALLEGATIONS REGARDING DEFENDANTS' RETALIATION

77.     Plaintiff re-alleges and incorporate the allegations of the paragraphs above as if
fully set forth herein.

### A.  Defendant CDS Receives Federal COVID Funds

#### 1.  PPP Funds

78.     The PPP was established in 2020 by Congress in response to the economic impact
of the COVID-19 pandemic.

79.     The PPP was enacted as part of the Coronavirus Aid, Relief, and Economic Security
Act to provide relief to America's small businesses and sole proprietors.

80.     The PPP was administered by the United States Small Business Administration
("SBA").

81.     The PPP provided small businesses with approximately $800 billion in

uncollateralized, low-interest loans.

82.    PPP loans were available to businesses in operation as of February 15, 2020 that had salaried employees, as well as sole proprietors, independent contractors, and self-employed workers.

83.    Applicants were required to certify that the "current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

84.    Recipients of PPP loans were entitled to forgiveness if three conditions were met: **(1)** employee and compensation levels were maintained; **(2)** the loan was spent on payroll and other eligible expenses; and **(3)** at least 60% of the loan was spent on payroll costs.

85.    CDS applied for a PPP loan during the first round of funding.

86.    Upon information and belief, CDS certified that the "current economic uncertainty makes th[e] loan request necessary to support the ongoing operations of [CDS]."

87.    CDS certified that the PPP loan would be used for the payroll costs for 43 employees.

88.    On April 13, 2020, CDS was approved for a $570,200 PPP loan.

89.    CDS's PPP lender was First-Citizens Bank & Trust Company.

90.    CDS applied for forgiveness of its PPP loan.

91.    Based on CDS's certifications that it used the PPP funds for payroll expenses and in accordance with federal law, the SBA forgave the entirety of CDS's PPP loan, including accrued interest.

92.    Upon information and belief, the total amount forgiven by the SBA was $573,732.

93.    Upon information and belief, CDS's representations in its applications for PPP funding and forgiveness were not true.

94. CDS's financial records show that:

   a. CDS was not having trouble making payroll when it applied for PPP funding.

   b. CDS's tuition revenue for the 2020–21 school year exceeded its budget by $41,000.

   c. CDS's financial assistance for the 2020–21 school year was projected to be $65,000 under budget.

   d. CDS's net tuition revenue for the 2020–21 school year increased $105,000.

   e. CDS's payroll costs were under budget for the 2020–21 school year.

   f. CDS's decreased payroll costs was due, in large part, to limited sports programs and aftercare offerings because of COVID-19 restrictions.

95. Upon information and belief, CDS knowingly made false statements and certifications in its application for PPP funds and request for PPP forgiveness.

96. Upon information and belief, CDS's statements and certifications that PPP funding was necessary to support its ongoing operations were false and fraudulent.

97. Upon information and belief, CDS's statements and certifications about its need for PPP funds were false and fraudulent.

98. Upon information and belief, CDS's statements and certifications about its use of PPP funds were false and fraudulent.

99. Upon information and belief, these false statements and certifications were material to the SBA's decision to approve CDS's PPP application.

100. Upon information and belief, these false statements and certifications were material to the SBA's decision to forgive CDS's PPP loan.

**2. EANS Funds**

101. Congress enacted the EANS Program to provide financial assistance to non-public

schools during the COVID-19 pandemic.

102.    Under the EANS Program, Governors and the Mayor of the District of Columbia could apply to the United States Department of Education for grant funding for non-public schools.

103.    The purpose of the EANS Program was to allocate funds to non-public schools that enrolled low-income students and were most impacted by the COVID-19 pandemic.

104.    Recipient non-public schools were required to use EANS funds for authorized expenses and return unspent funds.

105.    The U.S. Department of Education provided guidance to state departments of education as to how non-public schools should calculate the population of low-income students:

> To the extent a non-public school has these data available, the following data sources are recommended:
>
> - Available free or reduced-priced lunch data;
> - Scholarship or financial assistance data that identify students whose family income does not exceed 185 percent of the 2020 Federal poverty guidelines;
> - E-Rate data; or
> - Other relevant data, such as data that the non-public school has provided to the State for purposes of State or local programs that identify students whose family income does not exceed 185 percent of the 2020 Federal poverty guidelines.[3]

106.    "If complete actual data from a particular source are unavailable, data may be extrapolated based on a representative sample."[4]

107.    For non-public schools where this data is unavailable, the U.S. Department of Education proposed two alternative methods of determining the number of low-income students:

> - Data imputing the number of students from low-income families based on the American Community Survey (ACS) or the Small Area Income and Poverty Estimates (SAIPE) program by the U.S. Census Bureau; or

---

[3] https://oese.ed.gov/files/2021/09/Final-EANS-FAQ-Update-9.17.21.pdf.

[4] *Id.*

- Proportionality data: the number of students enrolled in a non-public school who reside in a Title I school attendance area multiplied by the percentage of public school students in that same attendance area who are from low-income families. If the non-public school has students who reside in more than one Title I school attendance area, multiple calculations would be necessary.[5]

108.    Governor Henry McMaster applied for an EANS grant.

109.    South Carolina was awarded more than $40 Million in EANS funding from the federal government.

110.    The South Carolina Department of Education ("SCDE") was tasked with administering and disbursing these federal EANS funds.

111.    The SCDE approved the U.S. Department of Education's methodology, detailed above, for calculating the number of low-income students.

112.    CDS requested EANS funding in 2021.

113.    In its EANS application, CDS reported that it had 258 students in the 2019–2020 school year.

114.    In its EANS application, CDS certified that 131 of these students were "from low-income families enrolled in the private school in the 2019–2020 school year."

115.    In its EANS application, CDS certified that 50.78% of its students were "from low-income families."

116.    CDS used "proportionality data" to determine the number of "low-income families" enrolled in the school.

117.    In its EANS application, CDS certified that "any funds received under the EANS program will be services or assistance not already funded by the PPP loan."

---

[5] *Id.*

118.    CDS provided the following explanation of its need for EANS funding:

As an independent school, Charleston Day School is dependent upon both tuition revenue and philanthropy to cover the cost of operations. On March 13, 2020, the school cancelled its major fundraising event, which was scheduled for March 13, 2020, due to the pandemic. We had anticipated netting $100,000 at that event, instead, the school was left with $65,000 in expenses. Following the Governor of South Carolina's orders, the school entered into remote learning beginning March 18, 2020. While we were able to provide interactive remote learning in the older grades, we modified learning in the younger grades as we were not able to provide the younger students with zoom-equipped technology. Remote learning continued through the end of that school year. The school opened the 2019–20 school year with 256 students. In the summer of 2020, the school had enrollment of 256 students for 2020–21, but later lost 9 students due to COVID-related issues. The school was able to add 3 students later in the school year, resulting in an overall decline in enrollment of 6 students. In addition, a number of families who were impacted by COVID required new or incremental financial assistance to remain at the school. As we entered the 2020–21 school year, in order to prepare the campus for in-person learning, the school has spent in excess of $260,000 in COVID-related expenses, including improvements to ventilation, sanitation, PPE, technology, software, hiring a nurse and other COVID related expenses. The school would not have been able to open its doors to students in August 2020 without these investments.

119.    Defendant Arnstein submitted CDS's EANS application on March 31, 2021.

120.    Defendant Arnstein and CDS agreed to the following certification:

I certify to the best of my knowledge and belief, all of the information in this application is true and correct. . . . I further understand that knowingly making a false statement or misrepresentation on this application may subject me to criminal or civil penalties under applicable State and Federal laws. I recognize that this application is subject to review and approval by the SCDE and may be approved, approved in part, denied, or denied in part. The amount available will be contingent upon the number of applicants and the total amounts requested.

121.    The SCDE approved CDS's application and awarded it $79,777.82 in EANS funding.

122.    The SCDE approved CDS for $46,429.82 in reimbursement and $33,348.00 in future expenses.

123.    This funding was awarded based on the certifications of Defendant Arnstein and CDS that *more than half* of its students were from low-income households.

15

124.    This funding was awarded based on the certifications of Defendant Arnstein and CDS that it suffered significant financial losses as a result of its cancelled "fundraising gala."

125.    Upon information and belief, CDS did not suffer significant financial losses.

126.    Upon information and belief, CDS's tuition revenue increased.

127.    Upon information and belief, CDS's payroll costs and operating expenses were under budget.

128.    Upon information and belief, only a minority of CDS's students are actually from low-income families.

129.    The Charleston County School District has approximately 80 schools.

130.    In 2020–21, 46 of these schools were Title I schools.

131.    Because most CDS families live in Charleston County, many families live in geographic areas served by Title I public schools.

132.    However, upon information and belief, the vast majority of CDS families are upper middle class and not "low-income."

133.    In fact, CDS's annual tuition is more than $25,000 *per student* for Lower and Middle School students.

134.    CDS does not award *any* 100% tuition grants.

135.    All CDS families "with children enrolled at Charleston Day are expected to pay some monetary amount as an indication of their support of and commitment to the program."[6]

136.    Families seeking financial aid are required to submit a Financial Statement, tax returns, and W-2 forms so that CDS has a full picture of the families' financial status.

137.    Upon information and belief, few students qualify for meaningful financial aid.

---

[6] https://www.charlestondayschool.org/tuition-and-financial-aid/.

138.    Upon information and belief, CDS used the "proportionality data" method in order to grossly and artificially inflate the percentage of low-income families on its application.

139.    For comparison, similarly situated non-public schools in Charleston listed substantially lower percentages of low-income students in their EANS applications.

140.    Upon information and belief, the Porter-Gaud School ("Porter-Gaud") used financial aid data and reported that 4% of its students were "low-income" on its EANS application.

141.    Upon information and belief, Mason Preparatory School ("Mason Prep") used financial aid data and reported that approximately 1% of its students were "low-income" on its EANS application.

142.    Upon information and belief, CDS had access to precise and accurate financial information for its students' families—namely financial aid applications and data.

143.    Upon information and belief, CDS knowingly made false statements and certifications in its application for EANS funding.

144.    Upon information and belief, CDS's statements and certifications that EANS funding was necessary to offset losses from its "fundraising gala" were false and fraudulent.

145.    Upon information and belief, CDS's statements and certifications that it would not have been able to operate during the 2020–21 year without EANS funding was false and fraudulent.

146.    Upon information and belief, these false statements and certifications were material to the SCDE's decision to approve CDS's EANS application.

**B.  Plaintiff Joins Defendant CDS's Board of Trustees**

147.    Plaintiff's two biological children, John Doe 1 and John Doe 2, and his niece, Jane Doe 1, (collectively, "Plaintiff's Children") were students at CDS.

148. Plaintiff's Children did not receive financial aid, and Plaintiff and his wife paid annual tuition for each of the Children.

149. Several members of CDS's Board of Trustees asked Plaintiff to join the Board of Trustees.

150. In June 2021, Plaintiff was elected to a three-year-term on the CDS Board of Trustees.

151. On August 19, 2021, Plaintiff attended his first meeting as a Trustee, which included orientation led by Defendant Hershey.

**C. Plaintiff's Investigation and Reporting of Defendant CDS's Improper Use of Federal COVID Funds**

152. Soon after becoming an active Trustee, Plaintiff began receiving complaints from parents about CDS's leadership.

153. Many of these complaints included concerns about CDS's acquisition and use of Federal COVID Funds.

154. CDS's Board of Trustees was aware of these concerns.

155. At a regularly scheduled meeting on October 12, 2021, CDS's Board of Trustees voted to transfer the operating surplus from the previous fiscal year to the endowment.

156. That operating surplus totaled $727,797.

157. Upon information and belief, the operating surplus included $570,200 in PPP funds and $36,555 in EANS funds.

158. Upon information and belief, CDS's financial accounting included Federal COVID Funds as if they were gross receipts rather than specifically allocated and earmarked loans and grants.

159. Based on the training Plaintiff received from Defendant Hershey, he had a fiduciary

duty to inform the Board of Trustees and Defendant Arnstein about concerns and complaints from parents.

160.    On December 15, 2022, Plaintiff voiced his concerns about CDS's lack of transparency to Defendant Hershey and CDS's Board of Trustees.

161.    On or about December 20, 2022, CDS removed Plaintiff's access to prior Board of Trustees meeting minutes.

162.    Plaintiff contacted CDS to ask why he was unable to access these meeting minutes and was not provided with a justification.

163.    In January 2022, Plaintiff noticed that more and more parents were frustrated by CDS's handling of the COVID-19 pandemic and were concerned that Federal COVID Funds were impacting CDS's policy decisions.

164.    On January 24, 2022, Plaintiff sent a text message to Trustee Jamie Hood asking to discuss CDS's PPP loan.

165.    On January 25, 2022, Plaintiff's wife emailed Attorney Blackburn and voiced concerns about whether CDS was entitled to Federal COVID Funds.

166.    On January 26, 2022, Plaintiff had a teleconference with Attorney Blackburn.

167.    During this teleconference, Plaintiff discussed his offers to facilitate an audit of CDS's acquisition and use of PPP funds.

168.    Plaintiff's offer was refused.

169.    On February 3, 2022, Defendant Hershey emailed Plaintiff and stated that his request for prior Board of Trustees meeting minutes was "very unusual."

170.    There is nothing unusual about a Trustee reviewing meeting minutes from prior Board of Trustees meetings.

171.    On the evening of February 3, 2022, Plaintiff received a phone call from Trustee Jamie Hood.

172.    Trustee Jamie Hood informed Plaintiff that the Executive Committee of CDS's Board of Trustees was convening a Special Meeting to remove Plaintiff's Children from CDS.

173.    On February 4 and 5, 2022, Plaintiff sent several text messages to Defendant Hershey to inquire why CDS was contemplating not renewing Plaintiff's Children's contracts.

174.    On the morning of February 5, 2022, Plaintiff contacted an AUSA to report concerns with CDS's acquisition and use of Federal COVID Funds.

175.    On the afternoon of February 5, 2022, Plaintiff talked to CDS's new attorney, Alice Paylor, by telephone and informed her that he had reported his concerns to the United States Attorney's Office.

176.    On February 5, 2022, Plaintiff sent the following text message to Defendant Hershey:

> It has become increasingly evident to me that this is retaliation for my asking about the PPP loans and for the meeting minutes going back to the beginning of the pandemic. As I told Jamie [Hood], this is a salvageable situation. Happy to discuss over the phone or in person like adults.

177.    Defendant Hershey did not respond to Plaintiff.

178.    On the evening of February 6, 2022, Plaintiff saw a man standing in his yard, shining a flashlight into Plaintiff's house, and shouting Plaintiff's name.

179.    Plaintiff opened the door and was served with a packet of documents from CDS ("the Packet").

180.    The Packet contained a cover letter from Defendant Hershey stating that CDS was holding a "special purpose CDS Board of Trustees meeting **on Friday, February 11th at 8:00–10:00am IN-PERSON at Rosen Hagood Law Firm (151 Meeting Street, Suite 400)** regarding

Re-enrollment Contracts for 2022–2023 and Trustee Update.

181.    The Packet contained printouts of various correspondence between Plaintiff, Plaintiff's wife, and CDS employees and Trustees.

182.    The Packet did not contain any notice that the Board of Trustees would be voting to remove Plaintiff from the Board of Trustees.

183.    CDS's Bylaws required that Plaintiff be provided five-days-notice that the Board of Trustees would be voting to remove him as a Trustee. *See* CDS Bylaws, Art. XVI, Section 16.1 ("Any officer or Trustee of the Corporation may at any time be removed by a two-thirds (2/3) vote of the entire membership of the Board of Trustees, at a specially called meeting of the Board of Trustees held after five (5) days prior notice thereof." (CDS Bylaws, Art. XVI, Section 16.1).

184.    The South Carolina Nonprofit Corporation Act required that the notice state that a purpose of the Special Meeting was the removal of Plaintiff as a Trustee. *See* S.C. Code § 33-31-808(e) ("A director elected by members may be removed by the members only at a meeting called for the purpose of removing the director and the meeting notice must state that the purpose, or one of the purposes, of the meeting is removal of the director.").

### D.  Defendants Remove Plaintiff from the Board of Trustees

185.    On February 11, 2022, the CDS Board of Trustees held the Special Meeting.

186.    The Executive Committee of CDS's Board of Trustees moved to remove Plaintiff from the Board of Trustees.

187.    Defendant Hershey introduced the motion on behalf of the Executive Committee.

188.    The Board of Trustees voted to remove Plaintiff as a Trustee.

189.    Plaintiff was then removed from the Special Meeting.

190.    The Board of Trustees then voted not to renew Plaintiff's Children's contracts.

191.    Later that day, Defendants Hershey and Arnstein sent Plaintiff a letter notifying him that his Children's contracts were not renewed for the 2022–23 school year.

192.    On February 15, 2022, Defendant Hershey sent an email to the entire CDS community confirming that the Board of Trustees removed Plaintiff and did not renew Plaintiff's Children's contracts.

**E.  Defendants Retaliate Against Plaintiff and His Children**

193.    After Plaintiff was removed from the Board of Trustees and Plaintiff's Children's contracts were not renewed, CDS and its Trustees, employees, and agents continued to retaliate against Plaintiff.

194.    Plaintiff and his wife set out to find an alternative school for their Children for the 2022–23 school year.

195.    Plaintiff and his wife applied to Mason Preparatory School ("Mason Prep).

196.    On March 10, 2022, Cherry Daniel, Plaintiff's wife's aunt, informed Plaintiff that she had learned from individuals associated with Mason Prep that CDS was attempting to prevent Plaintiff's children from being admitted to Mason Prep.

197.    In response, Plaintiff immediately contacted Trustee Jamie Hood to share this information and enlist his help in ensuring nobody acting on CDS' behalf was attempting to interfere with Plaintiff's attempt to enroll his children at Mason Prep or any other academic institution.

198.    On March 11, 2022, Mason Prep's Director of Enrollment, Jake Petty, separately informed both Plaintiff and his wife that the Children were being denied admission due to pressure from CDS.

199.    Four other families that had publicly supported Plaintiff at CDS were also denied admission to Mason Prep.

200.    The actions of CDS and its Trustees, employees, and agents caused Plaintiff great difficulty in finding a suitable school for the Children.

**<u>COUNT I</u>**
**Violations of the False Claims Act Anti-Retaliation Provision**
**31 U.S.C. § 3730(h)**
**(Against All Defendants)**

201.    Plaintiff re-alleges and incorporate the allegations of the paragraphs above as if fully set forth herein.

202.    Plaintiff was an agent of CDS during his tenure on the Board of Trustees.

203.    Plaintiff engaged in protected activity under the FCA.

204.    Plaintiff took the following lawful actions prior to his removal from the Board of Trustees in furtherance of a potential action under the FCA and in an effort to stop one or more violations of the FCA by Defendants:

 a.    After receiving complaints from parents, Plaintiff investigated CDS's acquisition and use of Federal COVID Funds.

 b.    Plaintiff's investigation uncovered potential misrepresentations and/or fraudulent certifications on:

  i.    CDS's EANS application;
  ii.    CDS's PPP application; and
  iii.    CDS's application for forgiveness of its PPP loan.

 c.    Plaintiff's investigation uncovered that CDS was potentially misusing its PPP funds;

 d.    Plaintiff notified several members of CDS's Board of Trustees—including Defendant Hershey and Trustee Jamie Hood—about problems with CDS's eligibility for, and use of, Federal COVID Funds.

 e.    Plaintiff notified CDS's Head of School—Defendant Arnstein—about problems with CDS's eligibility for, and use of, Federal COVID Funds.

 f.    Plaintiff offered to conduct an audit of CDS's acquisition and use of Federal COVID Funds.

g.  Plaintiff discussed his offer to conduct and audit to CDS's original attorney, Cherie Blackburn.

h.  Plaintiff reported his concerns about CDS's acquisition and use of Federal COVID Funds to an AUSA for the District of South Carolina.

i.  Plaintiff informed Attorney Paylor that he reported CDS to the United States Attorney's Office.

205.   Plaintiff's lawful actions concerned Defendants' false and fraudulent claims related to Federal COVID Funds.

206.   Plaintiff's lawful actions were motivated by an objectively reasonable belief that Defendants were violating, or would soon violate, the FCA.

207.   Plaintiff's lawful actions were made in furtherance of a potential action under the FCA and were designed to stop at least one violation of the FCA.

208.   Given his background as an attorney and AUSA, there was more than a distinct and reasonable possibility that Plaintiff would bring a viable FCA action against Defendants.

209.   Defendants' conduct reasonably could have led to a viable FCA action.

210.   Defendants were well-aware of Plaintiff's protected activity.

211.   Plaintiff was overtly investigating CDS's acquisition and use of Federal COVID Funds.

212.   Prior to his removal from the Board of Trustees, Plaintiff discussed his concerns and investigation with several CDS Trustees, Defendant Arnstein, and two CDS attorneys.

213.   Upon information and belief, Attorney Paylor, disclosed Plaintiff's investigation to the full Board of Trustees before he was removed as a Trustee.

214.   Upon information and belief, Attorney Paylor, informed the full Board of Trustees—including Defendants Hershey and Arnstein—that Plaintiff reported CDS to the United States Attorney's Office before he was removed as a Trustee.

215.     CDS, Defendant Hershey, and Defendant Arnstein were aware of Plaintiff's lawful acts in furtherance of a potential action under the FCA and to stop one or more violations of the FCA *before* the Board of Trustees voted to remove Plaintiff as a Trustee.

216.     Defendants took adverse action against Plaintiff as a result of his lawful acts in furtherance of a potential action under the FCA and to stop one or more violations of the FCA.

217.     Defendants called the Special Meeting of CDS's Board of Trustees as a result of Plaintiff's lawful acts in furtherance of a potential action under the FCA and to stop one or more violations of the FCA.

218.     At the Special Meeting, Defendants removed Plaintiff from CDS's Board of Trustees as a result of his lawful acts in furtherance of a potential action under the FCA and to stop one or more violations of the FCA.

219.     At the Special Meeting, Defendants voted not to renew Plaintiff's Children's contracts as a result of Plaintiff's lawful acts in furtherance of a potential action under the FCA and to stop one or more violations of the FCA.

220.     Upon information and belief, Defendant Arnstein was intimately involved with the decisions to remove Plaintiff as a Trustee and to not renew Plaintiff's Children's contracts.

221.     Defendants' retaliation continued after Plaintiff was removed from the Board of Trustees.

222.     Defendants interfered with Plaintiff's efforts to secure a suitable alternative school for Plaintiff's Children.

223.     Plaintiff has suffered significant damages and injuries as a result of Defendants' retaliation.

224.     Plaintiff has spent significant time and incurred significant expenses to find his

Children an alternative school.

225.     Plaintiff has incurred substantial attorneys' fees and costs as a result of Defendants'

retaliation.

226.     Plaintiff, his wife, and the Children have suffered personal and professional repu-

tational damages as a result of Defendants' retaliation.

227.     Plaintiff has experienced emotional distress as a result of Defendants' retaliation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter judgment against Defend-

ants, as follows:

a.  That Plaintiff be awarded damages as a result of Defendants' retaliation pursuant to 31
    U.S.C. § 3730(h);

b.  That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees,
    costs, expert fees, and expenses which Plaintiff necessarily incurred in bringing and press-
    ing this case;

c.  That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims triable alleged herein.

Respectfully submitted by:

**LAW OFFICE OF BILL NETTLES**
*Attorneys for Plaintiff*

/s/William N. Nettles
William N. Nettles (D.S.C. Federal ID No. 6586)
John L. Warren III (D.S.C. Federal ID No. 12164)
2008 Lincoln Street
Columbia, South Carolina 29201
Telephone: (803) 814-2826

June 21, 2023