UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Marshall Austin, | |
| Plaintiff, | Case No. 2:23-cv-2899-RMG |
| v. | **DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** |
| Charleston Day School ("CDS"), Emmie G. Hershey, Judith Foley Arnstein, | |
| Defendants. | |

## INTRODUCTION

Defendants Charleston Day School (the "Day School" or "CDS"), Emmie G. Hershey, and Judith Foley Arnstein move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The Complaint alleges that Defendants engaged in retaliatory actions against Plaintiff Marshall Austin and his family after he attempted to "ascertain the scope of" and "curtail" what he alleges to be misappropriation and misuse of federal funds.[1] Plaintiff asserts one claim, on his own behalf, for retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h). Plaintiff fails outright to state a claim because he did not have the requisite statutory relationship with the Day School and the FCA does not provide for individual supervisor liability. Furthermore, Plaintiff identifies allegedly adverse actions that simply do not qualify as retaliation under § 3730(h). For these reasons, Defendants respectfully request that the Court

---

[1] Defendants vehemently deny that there was any misappropriation or misuse of any of the COVID relief funds received by the School and affirmatively assert that Defendant Day School followed all laws and regulations required for a recipient of these funds.

dismiss the Complaint in its entirety with prejudice. Defendants also respectfully ask that the Court hold oral argument on this Motion.

## BACKGROUND[2]

The Complaint's timeline begins in June of 2021, when Mr. Austin became a member of the Day School Board of Trustees, and, omitting critically relevant information, jumps to February of 2022, when the Board of Trustees moved and adopted the motion, without a single dissenting vote, to remove him as a member of that Board.  To provide a complete contextual picture, Defendants will discuss the background leading up to the prime events set forth in the Complaint.

In spring of 2020, COVID took over the world and forced unexpected changes on every business and educational institution, including the Defendant Day School.  The pandemic was without precedent and without a roadmap, creating a global crisis that left no community untouched and that created healthcare and economic uncertainty, which persisted for the better part of two years.  In that uncertain environment, the Day School proceeded with two primary objectives: 1) maintain the safety of the Day School students, faculty, and families, and 2) provide the most effective educational experience possible given the circumstances, with a strong bias to in-person learning.

The Day School, through its Board of Trustees, chaired by Defendant Hershey and Head of School, Defendant Arnstein, worked closely with the Medical University of South Carolina to ensure that it was seeking appropriate medical advice, and followed the CDC Guidelines and those health recommendations adopted by the State of South Carolina.  Every educational institution had

---

[2] The background information provided herein is not set forth in the Complaint and is not relied on by Defendants in this Motion to Dismiss, which assumes that the only facts are those set forth in the Complaint, even though most of the allegations are not true and have no basis in fact. This motion sets forth the legal argument that, even if the Court assumes that every statement made in the Complaint is true, the Defendants are still entitled to judgment as a matter of law.

to move carefully to adhere to evolving healthcare guidelines, to adjust to ever changing conditions on the ground as infection rates cycled through spikes and troughs, and to tailor mitigation plans that addressed factors unique to each school, including classroom size, age of the children, campus configuration, availability and timing of vaccinations, and myriad other considerations, all while working each day to keep a healthy faculty in place to deliver on its educational mission.

Except for a brief period of state-wide imposed school closures, the Day School delivered in-person learning throughout the entirety of the pandemic.  This result was achieved in the best spirit of the Day School ethos by students, faculty, caregivers, and families coming together tirelessly, often at personal risk, and each willing to accept a measure of sacrifice and compromise to keep the Day School doors open.

Matt and Francie Austin were the antithesis of this ethos; they worked collectively to undermine the board, head of school, teachers, and health care providers, and they willfully and callously jeopardized the education of every Day School student in the pursuit of personal objectives stemming from their objections to masking protocols.  The Austins' personal conduct, which included deeply personal, gratuitous, and wholly unconstructive attacks on the head of school, board chair, and others, incessant threats of litigation, and the fomenting of fear, intimidation, and uncertainty across the Day School community, repeatedly failed the standards of baseline common decency and fell well short of the standards expected of a board member charged with acting in good faith on behalf of the Day School rather than in service to his own interests.  It should be noted that their conduct, including their attempts to undermine the school and to jeopardize the education of the students, the livelihood of the faculty, and the collective work of students, faculty, parents, grandparents, and friends of the Day School over its greater than 85-year history, has continued unabated to this day.

To be clear, the Board did not remove Mr. Austin to avoid scrutiny; rather, the Board removed Mr. Austin, and elected not to offer re-enrollment to the family, to protect the Day School and all those associated with it, knowing full well that these actions would likely trigger the response that Mr. Austin, as a "former federal prosecutor," had threatened—investigations, media attention, and litigation. The Day School is better served, however, defending a lawsuit than defending a decision to allow Mr. Austin to remain on the Board.

In Mr. Austin's brief tenure on the Board, he was approached regarding concerns about the sharing and custody of confidential information, as well as concerns regarding certain of his communications (his and Mrs. Austin's names were signed on an email to their children's classroom teachers in direct contradiction to Board guidance on COVID protocols, stoking fear, anxiety, and confusion among the faculty and attempting to supersede the authority of the Board and head of school). Mr. Austin texted the Board chair and head of school stating they should resign and hire a criminal attorney. He facilitated the actions of Mrs. Austin to cause disruption to school operations and, as a Board member, repeatedly failed to act in the best interest of the school. Members of the Board spoke with Mr. Austin on multiple occasions, first in an attempt to enlist constructive engagement and, when it became apparent he was working in concert with Mrs. Austin to undermine the school, to offer him openings to step down from the Board on his own terms, which he elected not to do.

As the COVID vaccine became widely available and the cases diminished, the Board looked at lifting the masking requirement and did so briefly toward the end of 2021. When COVID cases spiked again in January of 2022, the Day School again imposed a mask mandate along with virtually every other school in Charleston. During that time, Mrs. Austin began to harass the school administration, including Defendants Hershey and Arnstein, with repeated texts, emails,

and other communications concerning her opinions that (a) there were "health problems" associated with masking, and (b) the administration and leadership's decisions to continue to require masking were misguided and harmful to students and had to be stopped. Mrs. Austin called for the removal of both Defendant Hershey and Defendant Arnstein from their respective positions. On one occasion, Mrs. Austin sent an inflammatory text by accident to Defendant Hershey. She then followed with a second text to Defendant Hershey saying, "I shouldn't day-drink and text… Clearly meant that for someone else." Mrs. Austin stirred up the Day School community and created havoc with the parents, faculty, and students, telling many adults that they needed to get a lawyer. She even went so far as to text the school nurse at the very height of the pandemic saying, "I'd be careful because parents are getting attorneys involved and blaming you, Judith and Emmie. I'm worried you'll get blamed and possibly get in trouble with the Board, nursing board or whomever . . . ." Further, Mrs. Austin shared with the school nurse a screen shot of a text Mrs. Austin sent to Mr. Austin saying: "People are getting attorneys and plan to sue;" "The board will get sued;" "Put in writing to Emmie and email that you do not agree with these decisions and you as a board member did not vote to involve yourself in medical decisions;" and "These people are rich, angry and make me look sane!"[3]

At a time when every resource was required to keep the Day School open and safe, the Austins elected to actively undermine the interests of the school, to cause a diversion of resources and disruption to school operations, to directly undermine the leadership of the school, and to threaten legal action against Board members and school employees.

---

[3] Mrs. Austin is a licensed attorney who practices law in South Carolina. A copy of a portion of her and her husband's communications, etc., from December, 2021, to February, 2022, are attached hereto as Exhibit A.

It is for these reasons that Mr. Austin was removed from the Board and why the Day School elected not to offer re-enrollment contracts to the Austin family at the conclusion of the 2022 school year.[4]

As it relates to Mr. Austin's claims about the use of the Payroll Protection Plan (PPP) and Emergency Assistance to Non-Public School (EANS) funding, he manufactured these concerns only after it became obvious that his position on the Board was tenuous. His offer of "help" as a former federal prosecutor, "having prosecuted PPP fraud cases," was delivered and received as a very thinly veiled threat to tread carefully with him.

The Board is a volunteer body, with no personal financial incentives or rewards whatsoever. The Board and its Trustees have everything to lose and nothing to gain from fiduciary mismanagement. Quite the contrary to Mr. Austin's claims, in appropriately discharging its fiduciary duties, the Board and the Day School actively monitored all resources, both healthcare and financial, that were available to private schools to help them manage through the pandemic and to provide for a secure financial backstop. When the United States Congress enacted funding measures to help businesses, including public and nonpublic schools, the Day School, at the direction of its Board, along with most (if not all) nonpublic schools in South Carolina, applied

---

[4] Mr. Austin was removed as a Trustee of the Board of the Day School pursuant to Article XVI of the School's Bylaws due to Mr. Austin's repeated failure to act in the best interest of the school and his repeated efforts to disrupt school operations, question the authority of the head of school and the Executive Committee of the Board, and threaten legal action against Board members and school employees. Article XVI states: "Any officer or Trustee of the Corporation may at any time be removed by a two-thirds (2/3) vote of the entire membership of the Board of Trustees, at a specially called meeting the Board of Trustees held after five (5) days prior notice thereof." The Board voted to remove Mr. Austin with no dissenting votes. The Austins' behavior was in clear violation of the enrollment contract they both signed and which states: "Any parent/guardian who engages in behavior, communications, or interaction that are disruptive, intimidating, or otherwise seriously interfere with the School's accomplishment of its educational purpose, as determined by the school in its sole discretion, may be excluded from the school community and school property." As a result of their behavior, the Board declined to offer re-enrollment contracts to them.

for, and was granted, financial relief for which it qualified.[5]  The Day School, with the guidance

of its external auditors, completed the applications for PPP funding and EANS funding in

accordance with the requirements of the federal laws providing for these funding opportunities,

segregated these funds in a separate bank account, and used the PPP funds solely for faculty payroll

as required by the law.  In the fall of 2020, when the pandemic was still in full force globally,

before vaccines and a path to normalcy was visible, and while significant uncertainty remained,

the Day School, at the direction of its board, sought and received forgiveness of the PPP loan.  It

was a prescient decision as the worst of the pandemic was yet to arrive.  Over 20 non-public

schools in Charleston and over 300 non-public schools statewide also sought and received PPP

loan forgiveness.

      The Day School also applied for and received EANS funding along with close to 20 private

schools in the Charleston area and more than 100 private schools in South Carolina.  This federally

funded and state administered program was established specifically for private schools to cover

COVID-related expenses, including for example, personal protective equipment, cleaning

supplies, hand sanitizers, and other expenditures associated with maintaining the incremental

health and safety protocols of schools as required during the COVID pandemic.  Funds were not

allocated as block grants, rather all expenditures had to be for approved purposes under the

program.  In completing the application, the Day School sought and received advice and counsel

from the Palmetto Association of Independent Schools (PAIS), which was working as a liaison

between the South Carolina Department of Education and PAIS member schools, and specifically

sought advice on how to respond to a question about students from "low-income families." The

---

[5] Attached as Exhibit B are lists of non-public schools, which applied for and received federal
funds as grants under the EANS program, and which were granted and then forgiven loans under
the PPP program.

Day School does not solicit or maintain personal financial information from the parents whose children are enrolled in the school.  With no access to this data, the Day School was required to select from one of several approved options listed in the application, and the option the school selected ("Proportionality Data") reported the demographic make-up of the school based on the low-income student ratio in the School Attendance Area in which the applicant school students reside.  This data is supplied by the State of South Carolina.  The Day School was completely transparent in doing so as the form requires the respondent to indicate which option it has chosen in responding to the question.

Finally, Mr. Austin notes the transfer of a surplus to the school's endowment and the associated transactions that followed.  At the end of every fiscal year, the Board evaluates the financial results of the school to determine how to apply any surplus or how to fund any deficit. In the year Mr. Austin notes, the Board elected to transfer the operating surplus remaining at the end of the school's fiscal year into the endowment where the funds could be managed by the Investment Oversight Committee and the school's external investment advisor, rather than to simply hold the funds as excess cash in a checking account earning a near zero percent return. Those funds were then invested in keeping with the endowment's established asset allocation targets.  Given the ever-present concerns about market volatility, rather than putting the dollars into the market all at one time and risk investing at a peak point, the investments were made in three tranches to "dollar cost average" into the market.  The element of market timing is something that every prudent investor considers when entering and exiting the market.  Finally, every investment transaction in the endowment is executed by a third-party (the School's external investment advisor) and all associated records of those transactions are fully transparent and are maintained by that investment advisor.

The facts cited above were not included in the Complaint and cannot be considered in ruling on a Motion to Dismiss.  However, the Defendants want the entire story to be told because, even assuming that every "fact" alleged by Plaintiff is true, he has still failed to state a claim for relief under the FCA, as set forth below.

**FACTS ALLEGED IN COMPLAINT[6]**

Plaintiff is the parent of minor students who previously attended the Day School and, for a short time, between June 2021 and February 2022, he served on the Day School's Board of Trustees.  The Day School applied for federal financial assistance during the COVID-19 pandemic and received funds under both EANS and PPP (collectively, "Federal COVID Funds"), in a total amount of more than $600,000.  Compl., ¶¶ 2, 3.  Plaintiff was elected to the Board of Trustees "[a] short time after [the Day School] applied for and obtained these funds," and he "soon began receiving complaints from CDS parents who were concerned about CDS's leadership, CDS's response to the pandemic, CDS's receipt and use of Federal COVID Funds, and potential self-dealing by individuals on CDS's Board of Trustees."  Compl., ¶¶ 4, 5.

On December 15, 2021, Plaintiff "voiced his concerns about CDS's lack of transparency to the Defendant Hershey and CDS's Board of Trustees," and, on or about December 20, 2022, "CDS removed Plaintiff's access to prior Board of Trustees meeting minutes."  Compl., ¶¶ 160, 161.  "In January 2022, [he] noticed that more and more parents were frustrated by CDS's handling of the COVID-19 pandemic and were concerned that Federal COVID Funds were impacting CDS's policy decisions."  Id. at ¶ 163.  Plaintiff sought to "investigate CDS's acquisition and use of Federal COVID Funds."  He subsequently "learned of several irregularities, including potential misrepresentations on CDS's EANS application and misuse of PPP funds."  On January 24, 2022,

---

[6] For the sole purpose of this Motion to Dismiss, Defendants assume that all allegations in the Complaint are true, even though most are not.

"in an effort to stop this potential fraud," Plaintiff "raised concerns about CDS's eligibility for, and use of, Federal COVID Funds to CDS Trustee Jamie Hood." *Id.* at ¶¶ 11-13. Plaintiff "offered to initiate and oversee an audit of CDS's acquisition and use of Federal COVID Funds." The Day School refused this offer. *Id.* at ¶¶ 15, 168.

On February 3, 2022, Plaintiff learned from Trustee Jamie Hood that the school "planned to call a Special Board Meeting ("Special Meeting") to ensure that Plaintiff's children would not be able to reenroll at CDS." Compl., ¶ 22. On February 5, 2022, Plaintiff raised his concerns about the Day School's acquisition and use of Federal COVID Funds to a federal prosecutor, and he informed Alice Paylor, the Day School's counsel, of his conversation. *Id.* at ¶¶ 23, 24. Plaintiff received notice of the Special Meeting the following night. *Id.* at ¶ 25. Plaintiff alleges that "[w]ithout prior notice and in contravention of CDS' Bylaws, Defendant Hershey immediately moved on behalf of the Executive Committee for the Board of Trustees to enter Executive Session to consider the first agenda item: Removing Plaintiff from CDS' Board of Trustees." *Id.* at ¶ 29. The Board of Trustees removed Plaintiff from his position as a Board member. The remaining Trustees then voted not to renew the contracts for Plaintiff's children for the 2022-23 school year. *Id.* at ¶¶ 33, 34.

After these actions, Plaintiff applied to enroll his children at another private school, Mason Preparatory School ("Mason Prep"). Compl., ¶ 195. On March 10, 2022, his wife's aunt "informed [him] that she had learned from individuals associated with Mason Prep that CDS was attempting to prevent Plaintiff's children from being admitted to Mason Prep." *Id.* at ¶ 196. On March 11, 2022, Mason Prep's Director of Enrollment, Jake Petty, "separately informed both Plaintiff and his wife that the Children were being denied admission due to pressure from CDS."

"Four other families that had publicly supported Plaintiff at CDS were also denied admission to Mason Prep." *Id.* at ¶¶ 198, 199.

Plaintiff alleges that he "was an agent of CDS during his tenure on the Board of Trustees," that he engaged in protected activity, and that Defendants retaliated against him by removing him from the Board of Trustees, declining to renew his children's contracts, and interfering with his efforts to enroll his children at a different private school. *See* Compl., ¶¶ 202-222. Plaintiff seeks actual and special damages resulting from his "lawful acts in furtherance of a potential action under the FCA and to stop one or more violations of the FCA. *See* Compl., ¶ 216.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of the facts alleged in the complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). When considering a motion to dismiss, the court must accept as true all the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). However, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court. *Twombly*, 550 U.S. at 558 (quotation marks and citation omitted).

## ARGUMENT

The FCA is an anti-fraud statute that imposes liability for those who make false statements and submit false claims to the Government. 31 U.S.C. § 3729. The FCA contains a retaliation provision, also known as the "whistleblower" statute, intended to protect individuals who seek to expose violations of § 3729. The retaliation provision states:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that [individual] . . . whole . . . if that [individual] . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the [individual] . . . in furtherance of . . . efforts to stop [one] or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

Section 3730(h)(2) sets forth the remedies associated with a violation of § 3730(h)(1). In pertinent part, § 3730(h)(2) provides:

> Relief under [this section] *shall* include *reinstatement* with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h)(2) (emphasis added). These remedies are mandatory. *Brach v. Conflict Kinetics Corporation*, 221 F. Supp. 3d 743, 749 & n.12 (E.D. Va. 2016) (citing *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 872 (4th Cir. 1999) (holding that relief under § 3730(h) is mandatory)).

To survive a motion to dismiss, a plaintiff alleging injury under § 3730(h)(1) must show (1) he engaged in protected activity, (2) his employer, or the entity with which he has contracted or serves as an agent, knew about the protected activity, and (3) the employer, or the entity with which he has contracted or serves as an agent, took adverse action against him as a result. *See Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (citation omitted). *See*

*also United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017).

## I.    Plaintiff Fails to Allege the Necessary Statutory Relationship

In 2009, Congress amended the FCA retaliation provision by omitting the word "employer" as the only potentially culpable party and adding "contractor" or "agent" to "employee," as identifiers of a possible aggrieved party.  Fraud Enforcement and Recovery Act of 2009, Pub.L. No. 111–21, § 4, 123 Stat. 1617, 1624.[7]  The predominance of federal courts to consider the question have found that the amendment expanded the range of plaintiffs in FCA retaliation actions while still requiring that a defendant have an employment-type of relationship with the plaintiff.  *See, e.g., United States ex rel. Abu-Hussein v. Science Applications Int'l Corp.*, No. 2:09–cv–1858–RMG, 2012 WL 6892716, at \*2 (D.S.C. May 3, 2012) (collecting cases) *aff'd* 475 Fed. Appx. 851 (4th Cir. 2012) (per curiam); *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014) (citing 155 Cong. Rec. E1295–03, 2009 WL 1544226 (June 3, 2009) (statement of Rep. Howard L. Berman) (stating, as the House sponsor of the amendment, that the purpose of the amendment was to "cover[ ] . . . retaliation against contractors and agents of the discriminating party who have been denied relief by some courts because they are not technically 'employees'" and to "protect persons who seek to stop [FCA violations] regardless of whether the person is a salaried *employee,* an *employee* hired as an independent contractor, or an *employee* hired in an agency relationship") (emphasis included in citation).

While the legislative history of the FCA is clear that its central purpose is to enlist private citizens in combating fraud against the United States, and § 3730(h) is designed to protect

---

[7] The previous version of the statute read: "Any employee who is discharged, [etc.] . . . , or in any other manner discriminated against in the terms and conditions of employment by his or her employer . . . shall be entitled to all relief necessary to make the employee whole." 31 U.S.C. § 3730(h) (2006), *amended by* 31 U.S.C. § 3730(h)(1).

individuals who expose such fraud, Congress just as clearly "did not intend to grant a federal right of action against anyone and everyone." *United States ex rel. Bias v. Tangipahoa Parish School Board*, 816 F.3d 315, 324 (5th Cir. 2016).  Indeed, as this Court has noted, "[t]here is no indication in the revised statutory language of the 2009 amendments or in the legislative history that indicate a Congressional intent to broaden the scope of § 3730(h) to include potential defendants who have no employer type relationship with plaintiffs." *Abu-Hussein*, 2012 WL 6892716, at *3 n.4

Accordingly, district courts still "require[] some employment relationship acts as a continuing limiting principle," in assessing liability under § 3730(h).  *Bias*, 816 F.3d at 324 (determining that the 2009 amendment requires that courts expand the class of defendants beyond just employers but that courts should not interpret the amendment as a license to sue just anyone). "Defendants [] must be those by whom plaintiffs are employed, with whom they contract, or for whom they are agents"; and "the retaliatory action must be related to 'terms and conditions of *employment*,' or the contract or agency relationship."  *Id.* (emphasis in original) (citing 31 U.S.C. § 3730(h)(1)).

Therefore, to state a claim under § 3730(h), Plaintiff must have served the Day School as an employee, contractor, or agent, which terms the FCA does not define. Plaintiff alleges merely that in serving on the Board of Trustees he acted as the Day School's "agent," Compl., ¶¶ 52, 202; he does not allege that he served as an employee or contractor.[8]  Courts examining whether an

---

[8] Nor could he.  In the absence of any definition for "employee," courts must look to the "conventional master-servant relationship as understood by common-law agency doctrine." *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 739–40, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).  Under the common law, the primary indication of a master-servant relationship is a master's "right to control the manner and means" by which production is accomplished. *Reid,* 490 U.S. at 751.  As for "contractor," that status "requires the existence of some form of contract between parties." *Bias,* 816 F.3d at 325.  Plaintiff's position as a member of the Board of Trustees does not satisfy either definition, nor does he allege otherwise.  And, as discussed *infra*, this law applies equally to the agency relationship Plaintiff alleges.

agency relationship exists within the context of the FCA look to common law agency principles. *See Reid,* 490 U.S. at 740-41 (instructing courts to rely on "the general common law of agency, rather than on the law of any particular state," when attempting to give meaning to terms used in a federal statute"). *See also Bias*, 816 F.3d at 325 (applying common law agency doctrine).

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006). Put another way, "[a] relationship is not one of agency within the common-law definition unless the agent consents to act on behalf of the principal, and the principal has the right throughout the duration of the relationship to control the agent's acts." *Id.*, comment c. "The chief justifications for the principal's accountability for the agent's acts are the principal's ability to select and control the agent and to terminate the agency relationship, together with the fact that the agent has agreed expressly or implicitly to act on the principal's behalf." *Id.* A necessary element of agency is one person's "power to affect the legal rights and duties of the other person." *Id.*

An agent may act through "actual authority" or "apparent authority." "Actual authority is an agent's power to affect the principal's legal relations in accord with the agent's reasonable understanding, at the time the agent acts, of the principal's manifestations to the agent." Restatement (Third) of Agency at § 2.02, comment c. "Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." *Id.* at § 2.03, comment c.[9]

---

[9] The law of agency in South Carolina is consistent with common law agency principles. *See Roberson v. Southern Finance of S. C., Inc.,* 365 S.C. 6, 615 S.E.2d 112, 115 (2005) ("An agent's

While the existence of an agency relationship is typically a question of fact, the court can decide the issue as a matter of law where the facts are not in dispute. *Cf. Allen v. Greenville Hotel Partners, Inc.*, 409 F. Supp. 2d 672, 678 (D.S.C. 2006) (stating that where the facts concerning degree of control are not in dispute, "the court finds that whether there was sufficient control for an actual agency relationship to result and the alleged principal to owe a duty to the Plaintiffs is a question of law for the court").

The Complaint summarily states that Plaintiff acted as an agent of the Day School during his tenure on the Board of Trustees. However, Plaintiff offers no factual allegations to support that contention and the School's Bylaws, which comprise the only written document pertinent to the parties' relationship, demonstrates otherwise. *See Jamison*, 684 S.E.2d at 172 (starting its agency analysis by "looking at the three documents which govern the parties' relationships"). The Bylaws state in relevant part as follows:

> Section 3.1.     The direction and control of the Corporation shall vest in a Board of Trustees, consisting of not more than fifteen (15) members. Trustees shall be natural persons of full age.
>
> Section 3.2.     The Board of Trustees may exercise all such powers of the Corporation and do all such lawful acts and things as are not proscribed by statute, by the articles of incorporation, or by these By-Laws. The Board of Trustees may delegate to the Executive Committee, Head of School, or such other officer or employee, such authority as shall from time to time be necessary or desirable in the determination of the Board of Trustees.
>
>         . . . .
>
> Section 3.9.     A majority of the existing Board being present shall constitute a quorum for the transaction of business at any meeting of the Board of Trustees. **Each member of the Board of Trustees shall have one vote on any motion presented to the Board of Trustees and, unless otherwise stated herein, the**

---

authority is composed of his or her actual authority, whether express or implied, together with the apparent authority which the principal by his or her conduct is precluded from denying") (citing 2A CJS Agency § 132 (2004)). *See id.* ("[A]ctual authority is expressly conferred upon the agent by the principal").

**vote of a majority of the Board of Trustees members present at the time of the vote, if a quorum is present, shall be an act of the Board of Trustees**. The Board of Trustees shall have the authority to act without a duly called meeting of the Board of Trustees upon the affirmative unanimous action of the Board, duly noted in minutes contained in the corporate records of the Corporation. Members of the Board of Trustees shall abstain from any vote of the Board in which the member has a direct financial conflict of interest in the outcome of such vote.

Section 3.11. Any action which may be taken at a meeting of the Board of Trustees may be taken without a meeting if consent or consents in writing setting forth the action so taken shall be signed by all of the Trustees and shall be filed with the Secretary of the Corporation.

Section 4.1. The officers of the Corporation shall consist of a Chair, Vice Chair, Treasurer and Secretary, all of whom shall be elected by the Board of Trustees from its membership for a term not to exceed two (2) years. Any vacancy or vacancies in any of the offices of the Corporation, arising from whatever cause, excepting expiration of a term of office, shall be filled by the Board of Trustees at a Special Meeting of the Board of Trustees called for that purpose or at a Regular Meeting of the Board of Trustees. An officer shall be eligible to be reelected to his or her office for one additional term, but shall not serve more than two (2) successive terms.

Section 5.1. The Board of Trustees shall elect a Chair from its membership, who shall serve for a term of two (2) years and until his or her successor is elected. The Chair shall preside at all meetings of the Board of Trustees and the Executive Committee and shall be the executive head of the Corporation. She or he shall be charged with the general conduct and control of the operations of the Corporation under the supervision of the Board of Trustees, except such duties in the management and conduct of the Corporation's operations as may be devolved by the Board of Trustees to any other officer or employee.

Section 6.1. The Board of Trustees shall elect a Vice Chair from its membership, who shall serve for a term of two (2) years and until his or her successor is elected. The Vice Chair of the Board of Trustees shall preside at meetings of the Board of Trustees and of the Executive Committee in the absence of the Chair and shall, in general, perform all the duties of the Chair in the absence or disability of the Chair.

Section 7.1. The Board of Trustees shall elect a Treasurer from its membership, who shall serve for a term of up to two (2) years and until his or her successor is elected. The Treasurer of the Corporation shall be its fiscal agent. All of the records dealing with the finances of the Corporation shall be kept by the Treasurer under his or her supervision. The Treasurer shall give such security as shall be required by the Board of Trustees for the faithful performance of his or her duties.

Section 8.1. The Board of Trustees shall elect a Secretary from its membership, who shall serve for a term of up to two (2) years and until his or her successor is

elected. The Secretary of the Corporation shall keep a current record of the proceedings of all meetings of the Corporation and of the Board of Trustees and shall maintain them in a permanent record book.

Section 9.1. The Board of Trustees may delegate to an Executive Committee such of its powers, duties, and obligations as determined by the Board of Trustees from time to time. The Executive Committee shall consist of the Chair, Vice-Chair, Treasurer, Secretary and the immediate past Chair, if she or he is a member of the Board. The Head of School employed by the school shall participate, ex officio, in all meetings of the Executive Committee, but shall have no vote. The Executive Committee shall keep a complete record of all its proceedings and make a full report of the same to the Board of Trustees at its Regular Meetings.

Section 10.1 The Committee on Trustees shall consist of the Chair of the Board of Trustees and not less than two (2) or more than four (4) other members of the Board of Trustees, all of whom shall serve for a period of one (l) year upon appointment. The Head of School employed by the school shall participate, ex officio, in all meetings of the Committee on Trustees, but shall have no vote. From those appointed to the Committee on Trustees, the Chair of the Committee shall be appointed by the Chair of the Board of Trustees. At the Board of Trustees' April meeting, the Committee on Trustees shall submit to the Board of Trustees a list of names of proposed individuals to serve as members of the Board of Trustees and a list of names of individuals who have agreed to serve, if elected, as officers of the Corporation. Nothing contained herein shall prevent additional nominations from being made by any member of the Board of Trustees. At the Board of Trustees' May meeting, the Committee on Trustees shall vote to approve the new Board members and officers.

Bylaws, attached hereto as Exhibit C (emphasis added).

Significantly, these excerpts, along with their companion provisions, demonstrate that the Board of Trustees acts independent of the Day School's control; and the Complaint does not allege a contrary pattern or practice.   The Bylaws further demonstrate that the Board of Trustees is authorized to act only as a whole and by vote of the majority.  To the extent the Bylaws authorize any of the four officers to act individually, Plaintiff was not elected to an officer position and does not allege otherwise.

In short, Plaintiff, as an individual member of the Board of Trustees and holding no officer position, was not vested with authority to act on the Day School's behalf, nor was he subject to the

School's direction and control.  Accordingly, there is no agency relationship that could give rise to liability under § 3730(h).  On this basis, the Court should dismiss the Complaint in its entirety with prejudice.

## II.    The Statute Does Not Provide for Individual Liability

Furthermore, § 3730(h) does not extend liability to supervisors sued in their individual capacity.  According to the Complaint, Defendant Hershey is a member of the Day School's Board of Trustees and was the Chair of the Board during the relevant time period.  Compl., ¶¶ 65, 66. Defendant Arnstein served as the Head of School and was an *ex-officio* member of the Board of Trustees.  *Id.* at ¶¶ 69, 70.[10]  The Complaint asserts that Defendant Arnstein was somehow involved in the alleged fraud and that Defendant Hershey took actions to retaliate against Plaintiff. However, "the overwhelming majority of courts, including the Fifth Circuit, have held that the current version of § 3730(h) does not create a cause of action against supervisors sued in their individual capacities."  *Brach*, 221 F. Supp. 3d at 748 & nn.8, 9.

As explained by Judge Ellis in *Brach*:

> To state the obvious, the 2009 amendment to § 3730(h) expanded the class of potential plaintiffs, but is silent on the question whether a plaintiff may bring a cause of action against a supervisor sued in his individual capacity. Importantly, however, Congress is presumed to have known that courts had unanimously ruled that the pre–2009 version of § 3730 did not allow for individual supervisor liability. Thus, to accept [plaintiff's] argument—that Congress's amendment silently expanded § 3730(h) to include supervisor liability—is to assume that Congress overturned unanimous, pre-amendment judicial authority by negative implication. *See, e.g.,* [*Howell v. Town of Ball*, 827 F.3d 515, 530 (5th Cir. 2016)] ("Adopting [plaintiff's] argument means concluding that Congress overturned [unanimous] precedent, not by the insertion of express language expanding liability, but only by mere implication."); [*Aryai v. Forfeiture Support Associates*, 25 F.Supp.3d 376, 386 (S.D.N.Y. 2012)] (noting same). Such an

---

[10] The Complaint asserts no allegations that either Hershey or Arnstein "supervised" the Plaintiff, who was a member of the governing body of the School, so they could have no liability as "supervisors."  In fact, Plaintiff makes no allegations in the Complaint that he informed either of these individuals of his concerns about the federal funding, or that either of them took any actions to retaliate against Plaintiff.

assumption is unwarranted because Congress, had it intended to overturn unanimous case law, could have simply replaced the term, "employer," with "any person" in order to expand the class of potential defendants. As the Fifth Circuit has stated in addressing this precise issue, "[I]t is clear that the reference to an 'employer' [in § 3730(h) ] was deleted to account for the broadening of the class of FCA plaintiffs to include 'contractors' and 'agents,' not to provide liability for individual, non-employer defendants." *Howell*, 827 F.3d at 530.

*Brach*, 221 F. Supp. 3d at 749.

To further elucidate that the text of § 3730(h) "forecloses the argument that a supervisor may be sued in his individual capacity," Judge Ellis noted the mandatory remedies that § 3730(h)(2) prescribes, such as reinstatement, which "a mere supervisor could not possibly grant . . . in his individual capacity." *Brach*, 221 F. Supp. 3d at 749-50 (quoting *Yesudian ex rel. United States v. Howard Univ.*, 270 F.3d 969, 972 (D.C. Cir. 2001)). *See Aryai v. Forfeiture Support Associates*, 25 F. Supp. 3d 376, 387 (S.D.N.Y. 2012 ) ("The same logic [in *Yesudian*, 270 F.3d at 972] remains sound even after the 2009 amendment [because] interpreting amended section 3730(h) to provide for individual liability is inconsistent with the mandatory remedy of reinstatement"). Indeed, the Bylaws make clear that neither Defendant Hershey nor Defendant Arnstein could authorize reinstating Plaintiff to his former position on the Board of Trustees. *See* Exhibit C, Section 3.3.

In addition, SC Code § 33-31-834 provides that "[a]ll directors, trustees, or members of the governing bodies of not-for-profit . . . corporations . . . are immune from suit arising from the conduct of the affairs of these . . . corporations . . . . This immunity from suit is removed when the conduct amounts to wilful, wanton, or gross negligence . . . ." There is no allegation that either of the individual Defendants conducted herself in a willful, wanton, or grossly negligent manner.

In sum, Plaintiff cannot maintain this lawsuit as to Defendants Hershey and Arnstein, and the Court should dismiss them with prejudice.

### III.     The Predominance of the Alleged Retaliatory Acts Are Not Actionable

Finally, none of Defendants' alleged conduct post-dating Plaintiff's removal from the Board of Trustees is actionable under § 3730.  Plaintiff alleges in turn that *after* he was removed from the Board of Trustees, the Day School did not renew his children's contracts and the school, along with "its Trustees, employees, and agents," continued to retaliate against him.  Compl., ¶ 193.  But, as discussed, § 3730(h) provides a cause of action for retaliation only against an "employee, contractor, or agent."  To the extent Plaintiff could be considered an agent of the Day School during his tenure on the Board of Trustees—which contention Defendants assert fails as a matter of law—he ceased to be an agent once he was removed from the Board.  Any conduct that occurred after that removal, including but not limited to the Day School's decision not to renew the children's contracts and the alleged interference in enrolling the children elsewhere, is simply not actionable retaliation under § 3730(h).  *See, e.g., Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 244 F. Supp. 3d 1138, 1143 (D. Colo. 2017) ("The overwhelming majority of courts that have considered the issue have found that § 3730(h)(1) does not apply to post-employment retaliation[.]") (collecting cases), *aff'd*, 908 F.3d 610 (10th Cir. 2018).  *Cf. Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 769-70 (S.D.N.Y. 2021) (concluding that post-termination conduct could not provide the necessary forum connection for personal jurisdiction in a retaliation action) (collecting cases).

In a similar vein, the substantive relief available to Plaintiff under his agency theory applies only for protected actions he took during his tenure as a purported agent.  *Potts*, 244 F. Supp. 3d at 1142.  As the *Potts* court reasoned:

> Someone who took action and faced retaliation after leaving a company cannot enjoy reinstatement or back pay, since there is no missing job or compensation that she "would have had but for the [retaliatory] discrimination." That leaves only reimbursement for "special damages" like emotional distress, *see Neal   v.*

*Honeywell, Inc.*, 191 F.3d 827, 832 (7th Cir. 1999), as well as litigation costs and attorneys' fees. Yet Ms. Potts primarily seeks an injunction here, even though the FCA does not authorize such relief. *See* 31 U.S.C. § 3730(h)(2). She also seeks "special damages," but does not identify what damages she may be entitled to collect other than "attorneys' fees and costs." [] It strains credulity to suggest that Ms. Potts could be made whole by leaving the alleged retaliation unabated and restoring only her litigation expenses for this action. [] Thus, the only reasonable interpretation is that the FCA's anti-retaliation provision covers current employees to the exclusion of former employees.

*Id.* at 1142-43.

Thus, Plaintiff's purported entitlement to damages cannot extend beyond whatever alleged damages he incurred for any protected actions he took leading up to his removal from the Board of Trustees. And while Plaintiff seeks "damages as a result of Defendants' retaliation pursuant to 31 U.S.C. § 3730(h)," he has not alleged incurring any damages because of protected activity engaged in prior to his removal. *See* Compl., ¶ 204. Not unlike the plaintiff in *Potts*, Plaintiff's request to be made whole is limited strictly to recovering the fees incurred in bringing this lawsuit should he prevail.

## CONCLUSION

For the foregoing reasons, Defendants ask that this Court grant their Motion to Dismiss and dismiss the Complaint in its entirety with prejudice.

By: */s/ Alice F. Paylor*
    Alice F. Paylor, Fed. ID #3017
    Saxton & Stump, LLC
    151 Meeting Street, Suite 400
    Charleston, SC 29401
    (843) 414-5080
    afp@saxtonstump.com

ATTORNEYS FOR DEFENDANTS

Charleston, SC
August 18, 2023