IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Marshall Austin, | ) | Case No.: 2:23-cv-02899-JD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| Charleston Day School ("CDS"), | ) | |
| Emmie G. Hershey, Judith Foley | ) | |
| Arnstein, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This case arises from an alleged violation of the anti-retaliation provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h). Plaintiff Marshall Austin ("Austin") sued Defendants Charleston Day School ("CDS"), Emmie G. Hershey ("Hershey"), Judith Foley Arnstein ("Arnstein") (collectively "Defendants"), alleging they engaged in retaliatory actions against him and his family after he attempted to "ascertain the scope of" and "curtail" CDS's misappropriation and misuse of federal funds and that he is entitled to relief under the FCA. (DE 1 at 1.)

Presently before the Court is Defendants' Motion for Summary Judgment (DE 48).[1] Austin has filed his opposition to the motion (DE 57). For the reasons below, after carefully considering the parties' arguments and the record, the Court grants Defendants' motion for summary judgment (DE 48).

---

[1]     There are three pending motions in limine (DE 49, 50, and 51); however, because the Court grants Defendants' motion for summary judgment, all pending motions now are moot and are denied.

1

## I.     BACKGROUND

### A.     The Parties and the Federal Funds

#### 1.     Marshall Austin

Marshall Austin is a former federal prosecutor and served as a volunteer member of the CDS Board of Trustees ("the Board") from June 2021 to February 2022. (DE 1 ¶ 49.) He is the father of three minor children, all of whom were enrolled at CDS from the 2019–2020 through the 2021–2022 academic years. During his tenure on the board, Austin was engaged in school governance, serving on several committees. (*See* Pl's Ex. 29.)

#### 2.     Charleston Day School

Charleston Day School, Inc., is a nonprofit educational institution incorporated under the South Carolina Nonprofit Corporation Act and operated exclusively for educational, scientific, literary, and charitable purposes under Section 501(c)(3) of the Internal Revenue Code. (Bylaws § 1.1, DE 48-10 at 1.[2]) Its mission is to foster scholarship, integrity, respect, and responsibility in its students. (*Id.*)

CDS is governed by the Board, which is composed of up to fifteen members called "Trustees," each serving a three-year term, with eligibility for reappointment subject to term limits and reelection. (*Id.* § 3.1, DE 48-10 at 1.) The Board holds general authority to direct and control the corporation's affairs, exercising all corporate powers except where limited by law, the articles of incorporation, or the

---

[2]     For the reader's convenience, the Court cites to the relevant provisions of the CDS Bylaws ("Bylaws") with a parallel citation to the case docket.

Bylaws. (*Id.* § 3.2, DE 48-10 at 1.) It may delegate authority to the Executive Committee, Head of School, or other officers or employees as necessary. (*Id.*)

The Head of School, employed by the Board, serves as the administrative head responsible for the day-to-day conduct and control of school operations, including hiring, curriculum decisions, staff management, and budget administration. (Bylaws §§ 13.1–13.4, DE 48-10 at 5.) The Head of School serves at the pleasure of the Board and is periodically evaluated. (*Id.* § 13.1, DE 48-10 at 5.)

Corporate officers include the Chair, Vice Chair, Treasurer, and Secretary, all of whom are elected from among the Trustees for terms of up to two years, with eligibility for one additional consecutive term. (*Id.* § 4.1, DE 48-10 at 3.) The Chair serves as the executive head of the corporation, presiding over meetings of the Board and the Executive Committee. (*Id.* § 5.1, DE 48-10 at 3.) Officers and Trustees may be removed at any time by a two-thirds vote of the entire Board at a specially called meeting, as long as at least five days' notice is given. (*Id.* § 16.1, DE 48-10 at 7.)

### 3. Emmie G. Hershey

Hershey served as Chair of the CDS Board during the events at issue. (Pl's Ex. 36.) As Chair, she presided over all meetings of the Board and the Executive Committee. She was charged under the Bylaws with the general conduct and control of the corporation's operations, under the supervision of the Board. (Bylaws § 5.1, DE 48-10 at 3.) Hershey presided over the February 2022 special meeting at which the Board voted to remove Austin and deny reenrollment for his children. (Pl's Ex. 36.)

### 4.    Judith F. Arnstein

Arnstein is the Head of School at CDS. She is tasked with implementing Board policies, managing daily operations, and overseeing COVID-19 safety measures. Arnstein interacted with Austin regarding his inquiries into the school's use of federal funding. (*See* Austin Dep. 149:17–22, DE 48-6 at 38.)

### 5.    Federal Funding At Issue

Before Austin joined the Board, CDS applied for two sources of federal financial assistance. First, in April 2020, CDS applied for a $570,200.00 loan under the Paycheck Protection Program ("PPP"), established by the CARES Act, Pub. L. 116-136, § 1102, 134 Stat. 281, 289–294 (2020) (codified as amended at 15 U.S.C. § 636(a)), to help small businesses and nonprofits retain staff and maintain payroll during pandemic-related disruptions. The PPP, administered by the U.S. Small Business Administration, provided forgivable loans to cover payroll, employee benefits, rent, and utilities, subject to borrower compliance with program rules, including headcount and compensation requirements. The CDS Board debated and approved the loan, which was later fully forgiven. (Pl's Ex. 11.)

Second, CDS applied for financial assistance under the South Carolina Emergency Assistance to Nonpublic Schools program ("EANS"), authorized by the Coronavirus Response and Relief Supplemental Appropriations Act, 2021, Pub. L. No. 116-260, §§ 101–1006, 134 Stat. 1909–2148 (2020). Administered by the South Carolina Department of Education, this federally funded program provided emergency aid to eligible private schools to mitigate the disruptions caused by COVID-19. It covered expenses such as personal protective equipment, cleaning

4

supplies, educational technology, and staff training. Under the law, services, and assistance were provided for the benefit of the schools' students and staff, but not as direct cash payments to the schools themselves. *Cf. id.*, § 312(d)(7), 134 Stat. at 1928. CDS received $46,429.82 in reimbursements and $33,348.00 for future expenses. (Pl's Ex. 17 at 3, DE 57-17 at 3.)

## B.    Austin's Removal from the Board

Austin's three children were enrolled at CDS from the 2019–2020 school year through the end of the 2021–2022 school year. In March 2020, CDS suspended in-person learning because of the COVID-19 pandemic, but resumed in-person classes for the 2020–2021 year with masking and other safety protocols in place. Austin joined the Board of Trustees in June 2021. After joining as a Trustee, Austin was asked to fundraise and recruit for CDS by Emmy Hershey. (Austin Dep. 201:1–9, DE 48-6 at 51.)

While serving on the Board, Austin began investigating CDS's acquisition and use of federal COVID-19 relief funds, accessing the Board's online portal in December 2021 to review related materials. (Pl's Ex. 21 at 2–3, DE 57-21 at 2–3.) His access was soon cut off at Hershey's directive. (Pl's Ex. 22, DE 57-22.) Austin subsequently raised concerns with Trustee Jamie Hood and the Head of School, Arnstein, in January 2022. (Austin Dep. 143:18–143–6, DE 48-6 at 36; Austin Dep. 149:17–150:25, DE 48-6 at 38.) On January 26, 2022, Austin formally requested Board meeting records from January 2020. (DE 57 at 21.) On February 5, 2022, he contacted Assistant U.S.

Attorney Derek Shoemake to report concerns about CDS's use of PPP and EANS funds. (Pl's Ex. 33 at 3–4,  DE 57-33 at 3–4; Pl's Ex. 34, DE 57-34.)

The next day, Austin received notice of a Special Board Meeting to address "Re-enrollment Contracts for 2022–2023 and Trustee Update." At the February 11, 2022, meeting, all Board members were in attendance.[3] (Pl's Ex. 36 at 1.) The Trustees voted twelve in favor, with two abstentions, to remove Austin from the Board. They then voted eleven in favor, with two abstentions, not to renew the enrollment contracts for Austin's three children. (*Id.*)

CDS cited multiple reasons for these decisions, including Austin's breach of confidentiality obligations under the Bylaws (*see* Pl's Ex. 36 at 1; Hershey Dep. 8:24–9:20, DE 48-4 at 5); his threats of legal action, which were viewed as destabilizing; violations of parent conduct standards outlined in CDS's enrollment contracts; and breaches of fiduciary duty that undermined the Board's collective authority.[4] (*See* Pl's Ex. 36 at 1; Hershey Dep. 153:24–155:3, DE 48-4 at 26–28; Austin Dep. 138–140, DE 48-6 at 35.)

---

[3]     Under the Bylaws, a majority of existing Trustees constitutes a quorum, and Board action generally requires a majority vote of those present, with each Trustee holding one vote. (Bylaws § 3.9, DE 48-10 at 2.)

[4]     Mrs. Francie Austin, the plaintiff's wife, engaged in extensive communications with CDS administrators and staff during the 2021–2022 academic year, vigorously opposing the school's COVID-19 masking policies and repeatedly requesting exemptions for their child. Defendants characterize her communications as aggressive, disruptive, and confrontational, including numerous emails and direct interactions that escalated tensions between the Austin family and the school. These interactions were considered by the Board along with Mr. Austin's conduct when deciding not to renew the children's enrollment. (*See, e.g.*, Pl's Ex. 36; Hershey Dep. 154, DE 48-4 at 27.)

6

## C.    Austin Files Suit

On June 21, 2023, Austin filed a Complaint in this Court alleging that CDS, Hershey, and Arnstein retaliated against him in violation of the FCA. (DE 1.) He asserts that Hershey and Arnstein are liable as individual supervisors. (*Id.*) On September 30, 2024, Defendants moved for summary judgment, arguing that Austin cannot establish the required elements of his FCA retaliation claim. (*See generally* DE 48.) This so, they assert, for five reasons:

(1)    Austin was neither an employee, contractor, nor agent under the statute;

(2)    there is no evidence Austin engaged in protected activity under the FCA, as his inquiries arose only after learning of his removal and lacked any objectively reasonable basis;

(3)    Defendants did not know about any protected activity at the time of the adverse actions;

(4)    the Board's decisions were based on legitimate, independent reasons, including breaches of confidentiality, disruptive conduct, and legal threats; and

(5)    the FCA does not impose individual liability on non-employer supervisors or executives, entitling Hershey and Arnstein to judgment as a matter of law.

Austin has responded (DE 57), and Defendants have filed a Reply (DE 62). The matter now is ripe for adjudication.

## II.  LEGAL STANDARD

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of

a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* at 322. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citation omitted). If the burden of proof at trial would be on the nonmoving party "a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Celotex Corp.*, 477 U.S. at 324. "[T]he burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. "If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied[] . . . ." *Id.* at 332 (Brennan, J., dissenting).

Accordingly, once the movant has made this threshold demonstration, to survive the motion for summary judgment, under Rule 56(e), the nonmoving party must "go beyond the pleadings and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (citation

omitted). Under this standard, "the mere existence of a scintilla of evidence" in favor of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." *Wai Man Tom*, 980 F.3d at 1037.

"Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Cts*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting another source). "The court may grant summary judgment only if it concludes that the evidence could not permit a reasonable jury to return a favorable verdict." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). "Therefore, courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted and alterations adopted). A court improperly weighs the evidence if it fails to credit evidence that contradicts its factual conclusions or fails to draw reasonable inferences in the light most favorable to the nonmoving party. *See id*. at 659–60.

## II.     DISCUSSION

The Court addresses Defendants' grounds for summary judgment in three parts. First, the Court addresses the individual Defendants' supervisor liability. Second, the Court turns to Austin's employment status. Finally, the Court considers Austin's retaliation claim.

The FCA is an anti-fraud statute imposing liability on individuals or entities that submit false claims or false statements to the federal government. *See* 31 U.S.C. § 3729. The FCA also contains a retaliation provision—often referred to as the "whistleblower" protection clause—which provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

## A.     Supervisor Liability for Individual Defendants Under the FCA

Defendants argue that summary judgment is appropriate as to Defendants Hershey and Arnstein because § 3730(h) does not extend liability to individual supervisors or executives sued in their personal capacities. The Court agrees. Austin acknowledges that this Court has already addressed this issue and held that § 3730(h) does not authorize individual supervisor liability.[5] *See United States ex rel. Rauch v. Oaktree Med Ctr., P.C.*, No. 6:15-cv-01589-JD-JDA, 2021 WL 11745349 (D.S.C. July 8, 2021).

Although Austin tries to distinguish *Oaktree* by noting that the prior ruling arose at the motion-to-amend stage and involved an employment—not agency—

---

[5]     In *Oaktree*, this court ruled that 31 U.S.C. § 3730(h) does not permit direct suit against individual supervisors because the statutory language imposes liability only on employers. *Oaktree Med Ctr., P.C.*, 2021 WL 11745349, at \*4. Accordingly, the court rejected any common law, alter-ego theory and denied the plaintiff-relators' renewed motion to amend as futile.

10

relationship, Austin offers no authority holding that the 2009 FCA amendments expanded the class of permissible defendants to include non-employer individuals in suits brought by agents. The procedural posture of this case does not alter the controlling legal framework.

Assuming that Austin qualifies as an agent of CDS for purposes of this discussion, the Court's prior reasoning in *Oaktree* applies here. Courts across jurisdictions have consistently concluded that § 3730(h) imposes liability solely on employers, not on individual supervisors or corporate officers in their personal capacities. *See United States v. Texas*, 507 U.S. 529, 534 (1993); *Howell v. Town of Ball*, 827 F.3d 515, 529–30 (5th Cir. 2016); *Brach v. Conflict Kinetics Corp.*, 221 F. Supp. 3d 743, 748 (E.D. Va. 2016).

This limitation is reinforced by the specific structure and governance provisions set forth in the Bylaws. They make clear that the corporation is governed collectively by its Board of Trustees, which exercises corporate powers as a unit and acts through a majority vote or unanimous written consent. (Bylaws § 3.2, DE 48-10 at 1; Bylaws § 3.9, DE 48-10 at 2.) Individual Trustees—including the Chair—hold no unilateral supervisory or executive authority over fellow Trustees, as each Trustee has one vote and operates within the equal authority of the Board as a whole.

Similarly, while the Head of School (Arnstein) serves as the administrative head of the institution and is employed by the Board, the Bylaws expressly place the Head of School under the supervision and evaluation of the Board—not the other way around. (Bylaws § 5.1, DE 48-10 at 3; Bylaws §§ 13.1–13.4, DE 48-10 at 5.) Nothing

11

in the Bylaws grants the Head of School any supervisory power over Trustees, nor does it suggest that the Head of School may direct, manage, or control the actions of Board members.

The undisputed record thus confirms that Austin, as a Trustee, was not under the direction, supervision, or control of either Hershey or Arnstein. Instead, he functioned as part of a multi-member governing body, acting collectively and subject only to the Board's group authority—not the personal authority of any individual. Accordingly, any attempt to impose personal liability on Hershey or Arnstein under § 3730(h) falls squarely outside the statute's reach and is unsupported by the statutory text, legislative intent, or organizational governance structure.[6] With no legislative change or controlling precedent to the contrary, the Court finds that individual supervisor liability is unavailable under § 3730(h) on the facts presented, and summary judgment is warranted for Hershey and Arnstein on this ground.

## B.    Austin's Employment Status

Defendants next argue that Austin did not serve in the requisite capacity of "employee, contractor, or agent" of CDS and, therefore, cannot maintain his claim. The Court agrees.

Relief under § 3730(h) is available only where the claimant qualifies as an employee, contractor, or agent of the defendant entity. *See* 31 U.S.C. § 3730(h). It is

---

[6]    Even if Hershey or Arnstein acted as de facto decision-makers, the record contains no evidence that either exercised individual supervisory control *over Austin* or unilaterally directed the Board's actions. As addressed *infra* § B.2.b. of this opinion, there is no evidence of "control" in regard to the only individual actions Austin was asked to undertake. Control is required. Accordingly, no theory of de facto supervisory liability applies here.

undisputed that Austin was not an employee of CDS, nor did CDS engage him as a contractor. (Austin Dep. 200:7–18, DE 48-6 at 50; *see* DE 62 at 5.) Thus, to survive summary judgment, Austin must show that he qualified as an "agent" of CDS under the statute and that a genuine issue of material fact exists.

### 1.    The Law of Agency

Courts interpreting the term "agent" in the context of federal statutes apply common-law agency principles. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740–41 (1989) (directing courts to apply "the general common law of agency, rather than on the law of any particular state," to interpret federal statutory terms). Under the common law, an agency relationship exists where one person (the "agent") acts as a representative of another (the "principal") with the power to affect the principal's legal rights and obligations. *U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 325 (5th Cir. 2016). And "[a]n essential element of agency is the principal's *right to control* the agent's actions." *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) (emphasis added) (quoting another source).

There are two types of agency authority. The first type, actual authority, arises "when the principal expressly or implicitly grants the agent authority to perform a particular act." *Gallipeau v. Renewal by Andersen LLC*, 742 F. Supp. 3d 508, 517 (D.S.C. 2024) (quoting another source). "In private-sector organizations, actual authority, . . . , originates both with the statute through which the organization achieves a legally recognized form and with the organization's constitutional

documents." Restatement (Third) Of Agency (hereinafter, "Restatement") § 1.03 cmt. c. (Am. L. Inst. 2006).

The second type, apparent authority, arises when a third party reasonably believes the actor can act on behalf of the principal, and that belief is traceable to the principal's manifestations. *See Ashland Facility Operations, LLC v. N.L.R.B.*, 701 F.3d 983, 990 (4th Cir. 2012). This authority is not unlimited, however: "[t]he fact that one party performs a service that facilitates the other's business does not constitute such a manifestation." *Gallipeau*, 742 F. Supp. 3d at 518; *see also* Restatement § 3.03 cmt. b.

While agency relationships often raise factual questions, summary judgment is appropriate where the relevant facts are undisputed. *See Allen v. Greenville Hotel Partners, Inc.*, 409 F. Supp. 2d 672, 678 (D.S.C. 2006).

### 2. The Facts Offered to Show Agency

Under these principles, Austin argues that he qualifies as an agent of CDS under the FCA. Austin points to his service as a Trustee; his committee assignments and fiduciary obligations; insurance coverage language; and certain individuals' control over his access to Board materials. (*See* DE 57 at 21–24.) However, even taking all reasonable inferences in his favor, Austin has failed to carry his burden.

### a. *Austin's Status as a Trustee, His Participation on Committees, and CDS's Insurance Policy*

Austin's first argument is grounded on his undisputed status as "a volunteer Trustee" on the Board. (DE 57 at 23.) Austin parlays the legal consequence of this—

14

that he was a fiduciary and possessed of a duty of loyalty to CDS—as evidence of an agency relationship.[7] (*Id.*)

It is black-letter law that the fiduciary obligations attached to board members' roles arise from corporate statutes. *See* S.C. Code Ann. § 33-31-830 (West, Westlaw through 2025 Act No. 23). This is a separate basis from the law of agency. *Cf. Zornoza v. Terraform Glob., Inc.*, 419 F. Supp. 3d 715, 734 (S.D.N.Y. 2019) ("Neither the board of directors nor an individual director of a business is, as such, an agent of the corporation or of its members." (quoting another source)). So, it is irrelevant.

The Bylaws make clear that they do not grant actual authority to any single Trustee.[8] As noted *supra*, they explain that the Board operates as a collective governing body that exercises its authority through majority vote or unanimous written consent. (Bylaws §§ 3.2, 3.9, DE 48-10 at 2.) And Austin concedes that no

---

[7]    The Bylaws indicate that the Board is "incorporated under" the law governing nonprofit entities in South Carolina. (*See* DE 49-10 at 1, Bylaws § 1.1.) And commentary to the provision of that law governing the duties of nonprofit boards recognizes that "[b]oards of nonprofit corporations are sometimes called boards of trustees, regents, overseers, or by some other name" but that the duty rules apply regardless. S.C. Code Ann. § 33-31-801 Official Comment (West, Westlaw through 2025 Act No. 23).

Nothing in the record suggests that the term "trustee" denotes anything other than an arbitrary naming convention. *See id.* § 33-31-830(e) ("A director shall not be deemed to be a trustee with respect to the corporation or with respect to any property held or administered by the corporation[] . . . .").

[8]    With the caveat that the Board's membership is partially comprised of Officers. (Bylaws § 4.1, DE 48-10 at 3 (noting that "[t]he officers of the Corporation shall . . . be elected by the Board of Trustees from its membership).) The general rule is that director-officers *are* agents, *see* Restatement § 1.01 cmt. f(2), and the Bylaws make clear that is the case with CDS. (*See* Bylaws §§ 5.1, 6.1, DE 48-10 at 3 (explaining that the officer called the "Chair" has the authority to "*control* [] *the operations* of" CDS "under the supervision" of the Board (emphasis added)).) But, of course, Austin does not allege that he was an Officer.

15

formal resolutions were entered derogating from this structure and vesting him with any actual authority. (Austin Dep. 205:2–7, DE 48-6 at 52.)

But Austin contends that his service on three committees is evidence of a relationship of agency. (DE 57 at 23.) Austin points to a "Signed Certificate of Acknowledgement" and the phrase, contained therein, that says: "Trustee, officer, member of or advisor to a committee *with Board delegated authority*." (*See* Pl's Ex. 28 at 1, DE 57-28 (emphasis added).) But the disjunctive makes clear that the document says nothing about any relationship *Austin* had. And its reference to "delegation" is equally consistent with non-agency. In short, it begs the question of whether the "delegation" confers agency authority.

The Bylaws explain that "[e]ach Committee established by the By-Laws shall have the specific powers delegated herein in addition to those delegated to them from time to time by the Board of Trustees." (Bylaws § 14.3, DE 48-10 at 5.) And, of course, each of the relevant committees has certain specific, delegated responsibilities, which the Bylaws set forth. (*See, e.g.*, *id.* (noting the "Finance Committee shall . . . monitor implementation of the budget and the annual financial operations of the school," and "ensure completion of the annual audit of [CDS's] finances as conducted by an independent accounting firm").)

But Austin fails to allege facts showing how these responsibilities are not simply services rendered for CDS. *See* Restatement § 1.01 cmt. c ("Not all relationships in which one person provides services to another satisfy the definition of agency."). None of the specific Bylaws governing the relevant committees address

16

anything resembling a manifestation that Austin can bind CDS. And Austin does not explain how they do, as is his burden. *See id.* § 1.02 cmt. d ("The party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence."). Thus, the relevant constitutional documents do not convey actual authority.

Austin's argument about CDS's insurance policy—which defines "insured" to include Trustees when acting "on behalf of CDS" (DE 57 at 23)—again begs the question. "It is common practice for both for-profit and nonprofit corporations to carry directors' and officer's liability insurance." John H. Warren III, *Liability for Directors of Nonprofit Corporations*, S.C. Law. March 2017, at 45, 50. Nothing suggests this is evidence of Austin's agency authority.

In short—individually and in combination, the above amount to the "mere existence of a scintilla of evidence," *Liberty Lobby, Inc.*, 477 U.S. at 252, which is insufficient.

### b.    *Austin's Participation in Fundraising Activities and CDS's Purported Control of Access to Board Materials*

Austin's arguments about his apparent authority to fundraise and recruit require more discussion. Austin testified that other Trustees, on behalf of CDS, asked him to engage "in fundraising and recruitment" (DE 57 at 2), and he agreed. (Austin Dep. 201:1–13, DE 48-6 at 51.) Indeed, Austin engaged in these activities and explained in his deposition that he thought he *was* an agent with apparent authority. (Austin Dep. 204:14–18, DE 48-6.)

17

What's more, CDS's own evidence provides that "the wider community often does not understand that individual Trustees, particularly the officers, do not automatically have wider authority" than the collective Board. (Def's Ex. 12 at 442.) This risk is amplified by the fact that Austin was a committee-member, and committee-members were exhorted in the Bylaws to "seek out potential members from the community" for service. (Bylaws § 14.2, DE 48-10 at 5.) Taking reasonable inferences in Austin's favor, these pieces of evidence suggest a belief traceable to a "manifestation" from another—one of the two elements of agency.

But agency requires control. Indeed, the FCA requires facts suggesting that the Board "supervised [Austin] and evaluated his performance," *Tangipahoa Par. Sch. Bd.*, 816 F.3d at 325, or otherwise controlled Austin in an employee-like agency relationship. *Lemon v. Myers Bigel, P.A.*, 985 F.3d 392, 396 (4th Cir. 2021) (expounding, in context of the term "employee" in Title VII, that "the 'principal guidepost' for courts applying the principles of agency doctrine must be 'the common-law element of control'").

To assess control, the Court employs the six-factor balancing test approved by the Fourth Circuit Court of Appeals in a similar context:

(1)     "Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work";

(2)     "Whether and, if so, to what extent the organization supervises the individual's work";

(3)     "Whether the individual reports to someone higher in the organization";

(4)     "Whether and, if so, to what extent the individual is able to influence the organization";

(5)     "Whether the parties intended that the individual be an employee, as expressed in written agreements and contracts"; and

(6)     "Whether the individual shares in the profits, losses, and liabilities of the organization."

*Lemon*, 985 F.3d at 396 (quoting another source).[9]

The relevant factors here—all but the last one—point away from employee-like control. To begin with, while Austin can be fired, this can only happen through collective action and with the vote of the *other Trustees*. (*See* Bylaws § 16.1, DE 48-10 at 7.) As to supervision, Austin points to his deposition testimony that Hershey and Arnstein "exercised clear control" by "closing [Austin's] access to the board portal." (Austin Dep. 201:23–25, DE 48-6 at 51; *see also* Pl's Ex. 21–22, DE 57-21–57-22.) Austin further contends that this was not permitted by the Bylaws. But even if not, it is irrelevant. With regard to the work Austin asserts he was authorized to do,

---

[9]     In *Lemon*, the Fourth Circuit considered a Title VII challenge by a law-firm partner to her firm's decision to deny her short-term leave. *Lemon*, 985 F.3d at 394–95. Borrowing the factors set forth by the U.S. Supreme Court in *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 450 (2003), the Fourth Circuit affirmed the district court's dismissal on the basis that the law-firm partner had failed to plausibly plead she was an "employee" of the firm within the meaning of the relevant statute. *Id.* at 396–399.

That case is informative here. Of course, a partnership is different in important respects from a non-profit corporation. But there are critical relevant similarities here. For one, both the Board of Trustees and the law-firm partners in *Lemon* operated as the policy-setting, governing body of their organizations. Also, each Trustee has equal voting rights, like the law-firm partner in *Lemon*. Finally, as noted in-text, the term "agent" in the FCA requires the limiting principle articulated in the Title VII context in *Lemon*.

The Court does not break new ground. Other district courts have looked to Title VII cases defining "employer" to inform their interpretation of terms in the FCA. *See, e.g.*, *U.S. ex rel. Lamar v. Burke*, 894 F. Supp. 1345, 1347 (E.D. Mo. 1995); *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 459 F. Supp. 2d 1081, 1092 (D. Kan. 2006); *cf. Vessell v. DPS Assocs. of Charleston, Inc.*, 148 F.3d 407, 412 (4th Cir. 1998) (looking to U.S. Supreme Court precedent in ERISA context before *Clackamas* and before the relevant FCA amendments).

Austin has provided "no factually-grounded allegation that [he] reported to or received orders from any individual at" CDS. *Lemon*, 985 F.3d at 397.

As to the third factor, Austin does not report to anyone higher—indeed, the Bylaws "recognize[] no higher rank or responsibility" than "Trustee"—the position that Austin held. *Id.* Even Arnstein, the Head of School, "hold[s] office at the pleasure of the Board of Trustees" and is "formally evaluated" thereby. (Bylaws § 13.1, DE 48-10 at 5.) This makes clear that Austin, as a Trustee, influences the organization through his vote and through his committee service. (*See* Bylaws § 3.1, DE 48-10 at 1; *id.* § 14.1, DE 48-10 at 5.) By all accounts, Austin carried out his duties—including fundraising and recruiting—independently and without oversight. And the only evidence Austin points to about intention is his deposition testimony that he was approached to fundraise and recruit. (*See* Austin Dep. 201:6–13, DE 48-6 at 51.)

At bottom, there is insufficient evidence that Austin was controlled in like manner to an employee. And so, Austin has alleged no "employment relationship act[ing] as a continuing limiting principle" to CDS's liability. *Id.* at 324. Thus Austin has not provided sufficient evidence to carry his burden.

Austin's FCA retaliation claim fails as a matter of law on this threshold ground.

## C.     FCA Retaliation

Even if Austin qualified as an agent or could otherwise survived summary judgment on employment-status grounds, Defendants would still be entitled to

summary judgment on his FCA retaliation claim. To establish a retaliation claim under 31 U.S.C. § 3730(h), a plaintiff must plead and prove:

> (1)    that he engaged in protected activity in furtherance of a *qui tam* action or efforts to stop FCA violations;
>
> (2)    that his employer knew of this protected activity; and
>
> (3)    that the employer took adverse action against him because of this protected activity.

*See Shenoy v. Charlotte-Mecklenburg Hosp. Auth.*, 521 F. App'x 168, 174 (4th Cir. 2013) (per curiam) (citing *Zahodnick v. IBM Corp.*, 135 F.3d 911, 914 (4th Cir. 1997)). Here, the second and third elements are dispositive.

### 1.    CDS's Notice of Austin's Protected Activity

The notice requirement is assessed from the employer's perspective and focuses on whether the employer was aware of the plaintiff's protected conduct. *See Leverette v. Louisville Ladder, Inc.*, No. 3:19-CV-00268-SAL, 2022 WL 44812, at *8 (D.S.C. Jan. 5, 2022). Courts have underscored that "[s]tatements by an employee 'clearly couched in terms of concerns and suggestions, not threats or warnings of FCA litigation' do not constitute notice as required to make out an FCA retaliation claim." *Id.* (quoting another source). To establish causation, the plaintiff must show that the final decision-maker responsible for approving or implementing the adverse action was aware of the protected conduct. *See United States ex rel. Dillard v. Fluor Corp., Inc.*, No. 6:16-CV-02948-JD, 2022 WL 993667, at *4 (D.S.C. Apr. 1, 2022), *aff'd*, No. 22-1450, 2023 WL 8618545 (4th Cir. Dec. 13, 2023); *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001) (noting that

21

"[a] decision maker cannot have been motivated to retaliate by something unknown to him") (quoting *Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 934 (11th Cir. 1995)).

Mere temporal proximity between alleged protected conduct and adverse action is insufficient where the final decision-makers lacked knowledge of the protected activity. *See Hernandez v. Hernandez*, No. 6:16-CV-1807-ORL-28TBS, 2017 WL 2557066, at *3 (M.D. Fla. June 12, 2017). It is also not enough that other employees or supervisors were aware of the protected conduct if they lacked decision-making authority over the adverse action. *See Dillard*, 2022 WL 993667, at *4; *Reynolds v. Winn-Dixie Raleigh, Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (per curiam).

In this case, under the Bylaws, the decision to remove Austin as a Trustee was made by the full Board, acting collectively by majority vote. The record contains no evidence that the Board, as a body, was aware of Austin's alleged protected activity at the time it voted to remove him or declined to renew his children's enrollment. Austin admits that he never informed the Board as a whole of any concerns about federal COVID-19 funds. (Austin Dep. 147–154, DE 48-6 at 37–39.) Austin added that Defendant Hershey was the only Board member to whom he raised any concerns, though he could not recall when those conversations took place. (*Id.* 151:10–13, DE 48-6 at 38; Pl's Ex. 32, DE 57-32.) Austin also testified that his discussions with Trustee Jamie Hood in January 2022 focused on school COVID policies—not federal funding issues. (Austin Dep. 141–145, DE 48-6 at 36–37.) Notably, Austin concedes

22

that he never informed the Board or any other Trustee that he was considering a q*ui tam* action or retaliation claim under the FCA. (Austin Dep. 173–174, DE 48-6 at 44.)

Without such notice, Austin cannot establish the required causal link between any alleged protected activity and the Board's decision to remove him. Courts consistently hold that speculation, inference, or subjective beliefs are insufficient at the summary judgment stage. *See Dillard*, 2022 WL 993667, at *4.

Austin nonetheless seeks to impute knowledge to the Board by pointing to the alleged awareness of several individual Board members, including Vice-Chair Ross Hostetter, who testified that the Executive Committee felt the Board was "under investigation" by Austin. (Hostetter Dep. 144:14–23, DE 57-26 at 8.) Austin further contends that at least six Board members knew that he was raising concerns about CDS's conduct, including Trustees Jamie Hood, Summer Anderson, John Hand, Defendant Hershey, Defendant Hostetter, and Rutledge Young. (Austin Dep. 80:24–82:12, DE 48-6 at 20–21; *id.* 142:23–143:18, DE 48-6 at 36; *id.* 149:17–152:20, DE 48-6 at 38; *see* DE 57-21.) Austin argues that this individual knowledge, when aggregated, satisfies the Board's collective notice requirement.

However, Austin's effort to invoke the so-called "cat's paw theory" to impute knowledge or retaliatory motive to the Board lacks merit. Under *Staub v. Proctor Hospital*, 562 U.S. 411, 421 (2011), an employer may be held liable under a cat's paw theory if a biased subordinate performs an act motivated by retaliatory animus, intended to cause an adverse employment action, and that act proximately causes the final decision. Yet the cat's paw theory has clear boundaries: it applies only where

23

the biased actor's influence meaningfully shapes the adverse outcome, and it does not apply where the final decision-maker undertakes an independent assessment that severs the causal chain. *See Staub*, 562 U.S. at 421; *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 255 (4th Cir. 2015).

Here, the Bylaws required that the removal of a Trustee be decided by majority vote of the full Board. (*See* Bylaws § 3.9, DE 48-10 at 2.) The record shows that the Board, as the final decision-maker, acted independently through formal deliberation and vote, rather than merely rubber-stamping the recommendations of any one Trustee or committee. Austin offers no evidence that the alleged animus of Hershey, Arnstein, or any Executive Committee member proximately caused or dictated the Board's collective decision.[10] Without such proximate causation, the cat's paw theory cannot salvage Austin's retaliation claim.

### 2.    CDS's Non-Retaliatory Reasons for Removal

Even if Austin could establish a prima facie case of retaliation, Defendants have satisfied their burden to produce evidence of a legitimate, non-retaliatory reason for Austin's removal from the Board. As the Fourth Circuit has explained, "[r]etaliation claims can be proven by either the submission of direct evidence of retaliatory animus or by use of the *McDonnell Douglas* burden-shifting framework."

---

[10]    Moreover, Austin offers no evidence that any allegedly biased individual or subset of Board members exercised improper influence or domination over the collective Board sufficient to taint the final vote. The record reflects that the decision to remove Austin was reached by an independent vote of a multi-member body, and Austin has not identified any facts showing that the majority decision was simply a rubber stamp for the alleged animus of any one actor. Without evidence of such proximate causal influence, the cat's paw theory cannot apply.

24

*United States ex rel. Cody v. ManTech Int'l Corp.*, 746 F. App'x 166, 176 (4th Cir. 2018) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Under this framework, once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory justification for its allegedly discriminatory action. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). If the employer meets this burden, the plaintiff must then prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons but were a pretext for discrimination. *Id.*

### a.    CDS's Reasons

Assuming that Austin has made out a prima facie case, Defendants have presented multiple legitimate, non-retaliatory reasons for Austin's removal. The school's designated Rule 30(b)(6) witness, Rutledge Young ("Young"), testified that Board members were concerned Austin had leaked confidential information about the school's mask policy change. (Young Dep. 46:1–54:21.) Other witnesses confirmed this concern. (Hostetter Dep. 14:20–31:1, DE 48-3 at 2–19; *id.* 33:9–67:16, DE 48-3 at 23–54; *id.* 131:16–159:9, DE 48-3 at 64–92; *see* Hershey Dep. at 6:5–15:7, DE 48-4 at 2–11; Hershey Dep. 105–116, DE 48-4 at 14–25; *see also* Arnstein Dep. 67–85, 92–103, DE 48-5.)

Young also testified that Board members were troubled by Austin's aggressive conduct toward Board Chair Hershey and that his actions were viewed as disruptive to the day-to-day operations of the school. (Young Dep. 47–51; *id.* 53–54.) Specifically,

25

testimony from Hostetter, Arnstein, and others, suggests that the Board believed that Austin exhibited a deliberate opposition to the Board's functions, including undermining a Board-approved motion that delegated mask policy authority to the Head of School; communicating concerns to the school nurse about possible legal violations; and encouraging the school receptionist to avoid enforcing masking rules. Defendants have met their burden at this stage of the *McDonnell Douglas* framework.

To survive summary judgment, Austin "must point to admissible record evidence that [the employer's] stated justification is 'dishonest or not the real reason for [his] termination.'" *Nifong v. SOC, LLC*, 234 F. Supp. 3d 739, 759 (E.D. Va. 2017) (quoting *Laing v. Fed. Express Corp.*, 703 F.3d 713, 722 (4th Cir. 2013)). Moreover, a plaintiff cannot expose an employer's rationale as pretextual merely by focusing on minor inconsistencies that do not cast doubt on the explanation's validity or by raising points that are irrelevant to the stated reasons. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 216 (4th Cir. 2007). Importantly, it is not sufficient for a plaintiff to disagree with the employer's decision or believe it was unfair; the plaintiff must present evidence that the stated reasons were factually false or so implausible as to suggest intentional deception. *Id.* at 217–18.

### b. No Pretext for Removal

Here, Austin offers several categories of evidence to challenge Defendants' justifications. He points to deposition testimony from Hershey and Hostetter, who admitted they had no direct evidence that he breached confidentiality. (Hostetter Dep. 36:9–38:14, DE 57-26 at 2–4; Hersey Dep. 8:8–10:16, DE 57-27 at 2–4.) He

argues that his questioning of Hershey's and Arnstein's authority to limit access to Board minutes was a legitimate exercise of his Trustee role, citing confirmation from CDS's former legal counsel that they lacked authority to impose such restrictions. (Austin Dep. 201:14–202:11, DE 48-6 at 51; *see* Pl's Ex. 23 at 2, DE 57-23 at 2.)

Austin also disputes that he or Mrs. Austin disrupted school operations or opposed the Board's mask policy improperly, offering Mrs. Austin's deposition and communications reflecting health concerns raised in good faith. (Francie Austin Dep. 100–111, DE 57-37 at 12–23.) Austin highlights that Trustee Jamie Hood told Austin on February 3, 2022, that he had "done nothing wrong" and that the special meeting was being called because of the "tenor and tone" of Mrs. Austin's communications, not because of any opposition to Board decisions. (Austin Dep. 160–163, DE 48-6 at 40–41; *see* Pl's Ex. 23, DE 57-23.) Austin further asserts that as a Trustee, he had a fiduciary duty to investigate the school's federal funding (Austin Dep. 186–193, DE DE 48-6 at 47–49), and he challenges the factual basis of the school's claims that he or Mrs. Austin threatened the nurse or school staff (*Id.* 127:12–129:14, DE 48-6 at 32–33; Francie Austin Dep. 90–100, DE 57-37 at 2–12; Francie Austin Dep. 111–112, DE 57-37 at 23–24). Austin denies threatening legal action before learning his children's enrollment was at risk, contending that claims of litigation threats were exaggerated or false. (Austin Dep. 174–175, DE 48-6 at 44.)

That said, even taken together, this evidence does not rise to the level required to establish pretext. While Austin disputes the validity and fairness of the Board's conclusions, the record reflects that the Board's concerns were supported by the

27

perceptions and judgments of multiple members and were not solely based on the presence or absence of direct proof. *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (explaining that a court's role is not to determine whether the employer's decision was wise, fair, or even correct, but whether it was a cover for unlawful discrimination). Austin's assertions that his actions were justified or misunderstood do not negate the Board's independent decision-making process or show that its stated reasons were fabricated or false.

In short, Austin's disagreements with the Board's characterizations amount to challenges to the employer's business judgment, not affirmative evidence of pretext. Courts have uniformly rejected attempts to show pretext based solely on the plaintiff's disagreement with the employer's rationale. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279–80 (4th Cir. 2000). Even when the record is viewed in the light most favorable to Austin, no reasonable jury could conclude that Defendants' articulated reasons were a pretext for retaliation.[11] Accordingly, Austin's FCA retaliation claim cannot survive summary judgment under the *McDonnell Douglas* framework, and Defendants are entitled to judgment as a matter of law.

### III.    CONCLUSION

Having reviewed the record in the light most favorable to Austin, the Court finds no genuine dispute of material fact as to any of the grounds raised, and

---

[11]    Under Fourth Circuit precedent, *see Holland*, 487 F.3d at 217–18; *see also Hawkins*, 203 F.3d at 279–80, to survive summary judgment, Austin must present evidence that Defendants' reasons were so implausible or inconsistent as to suggest intentional deception. Austin has not made this showing. Accordingly, no reasonable jury could conclude that the stated reasons were false or a pretext for retaliation.

Defendants are entitled to judgment as a matter of law under Rule 56. Accordingly, for these reasons, Defendants Charleston Day School, Emmie G. Hershey, and Judith Foley Arnstein's motion for summary judgment (DE 48) is **GRANTED**, and this action is **DISMISSED.**

 **IT IS SO ORDERED.**

Joseph Dawson, III
United States District Judge

Florence, South Carolina
June 25, 2025