**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| Marshall Austin,<br><br>Plaintiff,<br><br>v.<br><br>Charleston Day School ("CDS"), Emmie G. Hershey, Judith Foley Arnstein,<br><br>Defendants. | Case No. 2:23-cv-2899-JD<br><br>**DEFENDANTS' RENEWED MOTION FOR COSTS AND ATTORNEYS' FEES** |

Defendants Charleston Day School ("CDS"), Emmie G. Hershey, and Judith Foley Arnstein (collectively, "Defendants"), by and through their undersigned attorneys, hereby renew their motion, made pursuant to Federal Rule of Civil Procedure 54(d), for the award of costs and attorneys' fees associated with defending this False Claims Act lawsuit initiated by Marshall Austin.[1]

Mr. Austin filed this action for violation of the False Claims Act ("FCA") on June 21, 2023. On June 25, 2025, this Court issued an Order granting Defendants' Motion for Summary Judgment on virtually all bases raised and argued, thereby resolving the lawsuit in its entirety in Defendants' favor. ECF No. 84. Mr. Austin appealed that decision on July 25, 2025, to the Fourth Circuit Court of Appeals. ECF No. 92. On October 19, 2026, the Fourth Circuit Court of Appeals affirmed this Court's decision in a published and reported decision. ECF No. 103. The mandate issued

[1] Defendants filed their original motion for costs and fees on July 9, 2025. ECF No. 86. On December 2, 2025, the Court denied the motion without prejudice and with leave to refile following issuance of the mandate. ECF No. 100.

November 10, 2026. ECF No. 104. As the prevailing parties, Defendants are entitled to an award of costs and fees.

## ARGUMENT

### I. Defendants are Entitled to an Award of Costs

Under Federal Rule of Civil Procedure 54, a prevailing party is entitled to an award of costs unless a federal statute, the Federal Rules, or a court order provides otherwise. Fed. R. Civ. P. 54(d)(1) ("costs . . . *should be* allowed") (emphasis added). Rule 54(d)(1) creates a presumption that costs are to be awarded to the prevailing party unless the district court finds the presumption is overcome. *Delta Air Lines, Inc. v. August,* 450 U.S. 346, 352 (1981); *Teague v. Bakker,* 35 F.3d 978, 995–96 (4th Cir. 1994). To overcome the presumption, a district court must justify its decision by "articulating some good reason for doing so." *Cherry v. Champion Int'l Corp.*, 186 F.3d 442, 446 (4th Cir. 1999) (citation omitted). But, ultimately, "[c]osts may be denied to the prevailing party only when there would be an element of injustice in a presumptive cost award." *Id.* (citation omitted).

Under this District's Local Rules, "[a] bill of costs may include all items set forth in the relevant statutes and rules and is subject to final approval by the court." Local Civ. Rule 54.03 (D.S.C.). Under 28 U.S.C. § 1920, a judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

Here, no element of injustice could possibly attach to an award of costs. As described in greater detail below, Mr. Austin initiated this lawsuit for no purpose other than to harass Defendants in pursuit of a personal vendetta. Defendants raised numerous legal arguments in their Motion for Summary Judgment and the Court ruled in their favor on virtually every argument.

As to the second inquiry, Defendants are clearly the prevailing parties. "The touchstone of the prevailing party inquiry must be the material alteration in the legal relationship of the parties." *Owners Ins. Co. v. Warren Mechanical, LLC*, 324 F. Supp. 3d 650, 656 (D.S.C. 2018) (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989)). As explained by the Supreme Court:

> Plaintiffs and defendants come to court with different objectives. A plaintiff seeks a material alteration in the legal relationship between the parties. A defendant seeks to prevent this alteration to the extent it is in the plaintiff's favor. The defendant, of course, might prefer a judgment vindicating its position regarding the substantive merits of the plaintiff's allegations. The defendant has, however, fulfilled its primary objective whenever the plaintiff's challenge is rebuffed, irrespective of the precise reason for the court's decision. The defendant may prevail even if the court's final judgment rejects the plaintiff's claim for a nonmerits reason.

*CRST Van Expedited, Inc. v. E.E.O.C.*, 578 U.S. 419, 431 (2016). The Court granted Defendants' Motion for Summary Judgment, entered judgment in their favor, and dismissed the lawsuit; in other words, the Court vindicated Defendants' position regarding the substantive merits of Mr. Austin's allegations. The Fourth Circuit affirmed the judgment on appeal.[2]

[2] Notably, in his response to the original motion, Plaintiff stated he "does not oppose Defendants' request for costs," and "acknowledges that an award of costs under Rule 54 is proper," ECF No. 87 at 4.

For these reasons, Defendants are entitled to an award of costs, which are set forth in the Bill of Costs attached hereto as **Exhibit A**.

## II. Defendants are Entitled to an Award of Fees

Defendants are likewise entitled to the attorney's fees they incurred in defending against this baseless lawsuit.

### A. Entitlement to Award

1. The Law

The FCA prohibits any person from making false or fraudulent claims for payment to the United States. 31 U.S.C. § 3729(a). The Act sets forth two principal enforcement mechanisms for policing this proscription: "First, the Attorney General may sue to remedy violations of § 3729," *id.* at § 3730(a); "[s]econd, private individuals may bring *qui tam* actions in the Government's name for § 3729 violations," *id.* at § 3730(b)(1). *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 411–12 (2005). In 1986, Congress created a third enforcement mechanism: a private cause of action for an individual retaliated against by his employer for assisting an FCA investigation or proceeding. 31 U.S.C. § 3730(h).

In general terms, section 3730 authorizes an award of attorney fees to the prevailing defendant in two instances: in civil actions brought under this section by the United States, *id.* at § 3730(g); and in civil actions brought under this section where the government does not proceed and "the person bringing the action conducts the action," *id.* at § 3730(d)(4). More specifically, as to the latter basis for fees,

> [i]f the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court

> finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

31 U.S.C. § 3730(d)(4).

Defendants are entitled to recover their fees in this action because they are the prevailing parties and the claim they were forced to defend against is clearly frivolous, clearly vexatious, and was brought primarily for purposes of harassment. Although Defendants need demonstrate only one of these three standards, *Mikes v. Straus,* 274 F.3d 687, 704-05 (2d Cir. 2001), abrogated on other grounds by *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 136 S. Ct. 1989, 195 L. Ed. 2d 348 (2016), the retaliation claim easily satisfies all three.

The FCA does not define "clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." However, the Fourth Circuit has defined frivolous, for the purpose of evaluating fee awards under § 3730(d)(4), as whether the claim, when viewed objectively, had "no reasonable chance of success." *United States ex rel. UBL v. IIR Data Solutions*, 650 F.3d 445, 458 (4th Cir. 2011) (citing *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 356 (4th Cir. 2009)). A claim is frivolous if it is utterly lacking in legal merit and evidentiary support. Although the Fourth Circuit has not yet defined, within this context, "clearly vexatious, or brought primarily for purposes of harassment," other circuits have offered guidance. *See UBL*, 650 F.3d at 458 (noting that "Courts, often looking to cases considering fee awards under 42 U.S.C.A. § 1988 for guidance, have given somewhat varying definitions of the phrase"). In particular, the Ninth and Fifth Circuits have held that "[a]n action is 'clearly vexatious' or 'brought primarily for purposes of harassment' when the plaintiff pursues the litigation with an improper purpose, such as to annoy or embarrass the defendant." *Pfingston v. Ronan Eng'r Co.,* 284 F.3d 999, 1006 (9th Cir. 2002) (applying standard used under 42 U.S.C. § 1988); *United States ex rel Bain v. Georgia Gulf Corp.,* 208 F. App'x 280, 283 (5th Cir. 2006).

Likewise, and in an analogous sense, South Carolina awards sanctions where a party pursues litigation frivolously. *See* S.C. Code Ann. § 15-36-10. Under the South Carolina Frivolous Civil Proceedings Act ("SCFCPA"), a party may pursue sanctions against another party where the offending party "failed to comply" with the following conditions:

> a reasonable attorney in the same circumstances would believe that under the facts, his claim or defense was clearly not warranted under existing law and that a good faith or reasonable argument did not exist for the extension, modification, or reversal of existing law;
>
> a reasonable attorney in the same circumstances would believe that his procurement, initiation, continuation, or defense of the civil suit was intended merely to harass or injure the other party; or
>
> a reasonable attorney in the same circumstances would believe that the case or defense was frivolous as not reasonably founded in fact or was interposed merely for delay, or was merely brought for a purpose other than securing proper discovery, joinder of proposed parties, or adjudication of the claim or defense upon which the proceedings are based.

*Id.* at 15-36-10(C)(1)(a)-(c).

Sanctions for violating the SCFCPA may include costs and attorney's fees to the prevailing party. *Id.* at 15-36-10(G). South Carolina and federal law alike impose safeguards like these to protect against frivolous *qui tam* actions, initiated for no reason other than to harass the defendant.

2. <u>Circumstances Specific to this Case that Support a Fee Award</u>

***a. The claim was frivolous.***

First, the retaliation claim had no reasonable chance of success. Mr. Austin asserted a single claim for retaliation in violation of 31 U.S.C. § 3730(h). The Complaint alleged that Defendants engaged in retaliatory actions against Plaintiff and his family after he attempted to "ascertain the scope of" and "curtail" what he alleged was CDS's misappropriation and misuse of federal funds.

To state a claim for FCA retaliation, a plaintiff must prove that (1) he took acts in furtherance of a *qui tam* suit (i.e., plaintiff engaged in "protected activity"); (2) his employer knew of these acts; and (3) his employer discharged him as a result of these acts. *Shenoy v. Charlotte-Mecklenburg Hosp. Auth.*, 521 F. App'x 168, 174 (4th Cir. 2013) (citing *Zahodnick v. IBM Corp.*, 135 F.3d 911, 914 (4th Cir. 1997)).

As an initial matter, the Court ruled *as a matter of law* that individual liability does not exist under the FCA and, on that basis alone, entered judgment in favor of the individual Defendants, Ms. Hershey and Ms. Arnstein. ECF No. 84 at 10-11. Moreover, this Court had already ruled, in 2021 (two years prior to when Mr. Austin filed his Complaint), that § 3730(h) "does not permit direct suit against individual supervisors because the statutory language imposes liability only on employers." *Id.* at 10 n.5 (citing *United States ex rel. Rauch v. Oaktree Med Ctr., P.C.*, No. 6:15-cv-01589-JD-JDA, 2021 WL 11745349 (D.S.C. July 8, 2021)). Yet, as addressed in more detail below, Mr. Austin persisted in prosecuting Ms. Hershey and Ms. Arnstein for the past two years despite Defendants' attempts to negotiate their dismissal, for no good reason other than to cause them distress.

Next, the Court found that the retaliation claim failed on the "threshold ground" that Mr. Austin was not an employee, contractor, or agent of CDS. ECF No. 84 at 20. Mr. Austin never claimed to be an employee or contractor. And, in his Complaint, he offered a single, threadbare allegation of agency: "Plaintiff was an agent of CDS during his tenure on the Board of Trustees." ECF No. 1 at 7, ¶ 52. As Defendants noted in their Motion for Summary Judgment, the existence of an agency relationship is typically a question of fact. Mr. Austin, however, was unable to create a single material dispute of fact regarding his agency theory.

The Fourth Circuit agreed and affirmed the Court's ruling on this threshold issue. Specifically, the Fourth Circuit found that "[t]he record simply provides no evidence of Austin's ability to bind CDS, to affect or alter the legal rights and duties of the school." ECF No. 103 at 7. The Fourth Circuit also explained:

> Austin's proposed view of agency would disrupt trustee-guided institutions across the nation. Again, hobnobbing with outside parties is usually a core part of a trustee's work. Most trustees do that. If Austin is right about agency, most trustees automatically become agents with apparent authority in their individual dealings with third parties—at least in matters related to fundraising and recruiting. That would give them more authority to bind their institutions by acting individually than by voting. They could go off and make binding promises and contracts without any vote or any board input. Or they could subject their institutions to tort liability. See Rest. (Second) § 12 cmt. a (noting that power to affect principal's obligations may consist in power to create tort liability). An institution would be at the mercy of individual trustees. That power defeats the purpose of a corporate board, which is meant to guarantee collective decision-making.
>
> In that sense, Austin's loose view of agency would deal a blow to the majority rule that forms part of the sinews of democratic governance. Majority rule is the norm in both the private and public sectors. Majority rule also boasts major advantages. Governing boards get to hash things out and to hear all perspectives. Majority rule leaves those who do not prevail with at least the comfort that they have been heard. It avoids the dangers of abrupt and arbitrary decisions. It is, in short, the American way of doing things, and it ensures that even the Chairwoman of the Board or the Chief Justice of the United States receives the value and benefit of varied voting voices around them.
>
> . . . .
>
> We recognize and respect the fact that board members often disagree on matters coming before them. Each side here believes it was acting not only in good faith but in the best interest of the institution. We have no need to take sides in this dispute. What we cannot do, however, is depart from the text of the statute in a manner that would permit many of the manifold disagreements within a board to sow the seeds for a False Claims retaliation suit. The internal mistrust that would follow underscores why Congress in no way acted impermissibly in defining the contours of FCA retaliation as it did.

*Id.* at 9-11. Thus, the Fourth Circuit found it need go no further than a straightforward application of the governing statute to determine that the award of summary judgment to Defendants was proper.

This Court went even further, however, and proceeded to review Defendants' arguments regarding the elements of the claim. As to the first element, Mr. Austin "admit[ted] that he never informed the Board as a whole of concerns about federal COVID-19 funds," and never informed the Board or any Trustee that he was considering a *qui tam* action or retaliation claim under the FCA. ECF No. 84 at 22-23 (citing Austin Dep. 147–154, DE 48-6 at 37–39; Austin Dep. 173–174, DE 48-6 at 44). "Without such notice," the Court found, "Austin cannot establish the required causal link between any alleged protected activity and the Board's decision to remove him." *Id.* at 23. The Court also easily dispensed with Mr. Austin's "cat's paw theory," thanks in large part to the substance and application of the Bylaws. *Id.* at 23-24. None of this critical evidence was new to Mr. Austin, indeed, he was at the center of it all. He was perhaps the person most familiar with the substance and timing of these conversations and, as a former Trustee, would have known how the Board operates, in accordance with its Bylaws. Yet, he filed this lawsuit anyway, notwithstanding his intimate familiarity with the undisputed evidence and his knowledge of FCA law (addressed below).

***b. The claim was vexatious and initiated with the intent to harass Defendants.***

Second, this was vexatious litigation, initiated for the improper purpose of embarrassing and discrediting Defendants as a way to exact revenge for the Board's decision not to re-enroll Mr. Austin's children for the next school year.

To begin, Mr. Austin knew better. He is a former federal prosecutor. He made his work history known in the publicly filed Complaint, ECF No. 1 at 2, ¶ 11, and he referenced his former

government position in his dealings with Defendants, ECF No. 48-3 at 76, 143:13. He testified during his deposition that he worked on whistleblower cases. ECF No. 48-6 at 3, 12:11-13. When he initiated this lawsuit, he was employed as a partner at Nelson Mullins, where his bio read that he "routinely provides guidance to elected officials, corporate executives, and ultra-high net worth individuals navigating complex, high-stakes situations including government investigations and indictments, whistleblower complaints, and internal investigations." Nelson Mullins, https://www.nelsonmullins.com/professionals/matt-austin#main (last visited June 30, 2025). Mr. Austin is not simply a practicing attorney, he is an attorney who focuses his private practice on this area of the law.

The evidence of record reflects that the Austins were outraged by the school's decision not to re-enroll their children. Mr. Austin learned of the decision during a phone call with Board member Jamie Hood on February 3, 2022, during which call Mr. Hood told Plaintiff that "the tenor and tone of (Mrs. Austin's) communications was making it hard for the executive committee to do their business . . . .", to which Mr. Austin responded, "if that's the case, if you're telling me I haven't done anything wrong and they – they are going to kick my kids out, then I'm going to sue." ECF No. 48-6 at 35, 140:8-20. On February 5, 2022, Mr. Austin contacted an Assistant United States Attorney because he "was scared about what people were doing to [his] family . . . . I was certainly, certainly mad . . . it was a very, very harsh reaction." *Id.* at 42, 165:14-25. But, as Ms. Hershey testified, the motion to remove Mr. Austin from the Board was based on his "repeated failure to act in the best interests of the school, to cause disruption to school operations, to question authority of the head of school and the executive committee of the board of trustees, to threaten legal action against board members and school employees." ECF No. 48-4 at 27, 154:5-155:3. Mr. Austin even testified that he had no reason to be concerned about the school's use of

PPP funds until he learned that the school intended to take adverse action against him. ECF No. 48-6 at 41, 164:6-17.

The retaliation claim was frivolous, and Mr. Austin knew it. He filed the lawsuit because he and his wife were angry that their children were not invited back for the next term. To exact a penance, the Austins took to the courts. They not only sued CDS, they sued Ms. Hershey and Ms. Arnstein, despite case law authored by *this Court* that exposes the clear lack of statutory authority to support naming individuals in a § 3730(h) claim. The parties twice attempted to mediate, and Mr. Austin demanded that both individual Defendants attend the mediations in person.[3] As for CDS, he knew the content of the material evidence at the time he filed suit and yet he charged forward, with what can only be described as a baseless agency theory, until the Court ultimately awarded summary judgment to Defendants on basically every ground, from no individual liability and no employment relationship to no causal relationship and no evidence of pretext.

The retaliation claim was frivolous *and* the Austins pursued it for the improper purpose of punishing Defendants.

**B. Amount of Award**

As set forth in the declaration of Alice F. Paylor, attached hereto as **Exhibit B**, Defendants seek **$394,432.91**[4] in attorney fees.

The Fourth Circuit has explained that "[i]n calculating an appropriate attorneys' fee award, a district court must first determine the lodestar amount (reasonable hourly rate multiplied by hours reasonably expended), applying the *Johnson/Barber* factors when making its lodestar determination." *Vuyyuru*, 555 F.3d at 356-57. *See* Local Civ. Rule 54.02(A) (D.S.C.) ("Any

[3] Defendants did not have Ms. Arnstein and Ms. Hershey attend the mediation because the individuals had nothing to contribute to any potential settlement.

[4] This amount represents only the legal fees. An additional $5,914.05 is requested in the Bill of Costs which reflects the costs of deposition transcripts and videography services.

petition for attorney's fees shall comply with the requirements set forth in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978), and shall state any exceptional circumstances and the ability of the party to pay the fee"). Those factors include: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *Id.* at 357 (quoting *Spell v. McDaniel,* 824 F.2d 1380, 1402 n.18 (4th Cir. 1987).

1. Time and Labor Expended.

The defense of this case involved the work of three attorneys and one paralegal and spanned almost exactly two years (not including the pendency of the appeal). This legal team was required to meet short deadlines and respond to complex matters, all of which required the expenditure of significant time.

Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and ultimately filed an Answer. The Court amended the pretrial scheduling order three times and ordered the parties to mediation. The parties engaged in extensive discovery, including six individual depositions and a Rule 30(b)(6) deposition, as well as discovery motion practice, and undersigned counsel filed numerous motions in limine. Undersigned counsel's pretrial efforts culminated in the filing of an approximately 400-page motion for summary judgment package.

The individual Defendants had never before been sued and were distressed over the allegations raised against them and the publicity the Complaint generated and requested additional information to resolve their concerns.

2. Novelty and difficulty of the questions raised and undesirability of the case.

Mr. Austin sued a well-known, well-established private school situated in the community (mere blocks from the courthouse), along with two individuals affiliated with the school. The Complaint alleged that the school had committed fraud on the federal government. Although a retaliation claim under the FCA is not novel in and of itself, such a claim in this context, involving these parties, is novel to the local community. Indeed, the lawsuit was a matter of local interest and received press coverage. Defending against the lawsuit required counsel and their clients to navigate public scrutiny and the court of public opinion, which was quick to judge Defendants on account of the allegations that ultimately lacked any evidentiary support. [5]

3. Skill required to properly perform the legal services rendered.

FCA litigation is complex. Many attorneys who practice in this area of the law specialize in FCA litigation and practice little else.[6] This litigation also requires experience in federal court and familiarity with the associated Rules and law. As previously stated, even though the Complaint raised only one claim, defeating the claim involved developing multiple theories, e.g., absence of employer relationship, absence of causal connection, and absence of pretext, which required time-consuming legal research as well as extensive discovery.

---

[5] *See, e.g.,* Will Folks, *Charleston Day Fraud Allegations: Damning Details Unearthed*, FitsNews (September 4, 2024), https://www.fitsnews.com/2024/09/04/charleston-day-fraud-allegations-damning-details-unearthed/. The online publication FitsNews regularly accepted Mr. Austin's allegations as true and falsely disparaged CDS, the individual Defendants, and CDS's lawyers.

[6] As an example, former opposing counsel's law firm markets itself as specializing in FCA and whistleblower law. Bill Nettles, Attorneys at Law, https://billnettleslaw.com/ (last visited July 1, 2025).

Additionally, the Plaintiff appealed. The Defendants defended against the appeal and undersigned counsel traveled to Richmond, VA to present oral argument to a panel of the Fourth Circuit.

4. Opportunity costs in pressing the instant litigation.

This matter consumed an inordinate amount of time for Defendants' lawyers and prevented them from engaging other clients and pursuing other litigation matters.

5. Customary fee for like work and attorney's fee awards in similar cases.

An hourly rate is considered reasonable when it is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 890 n.11 (1984).

In the Charleston market, typically, for civil litigation matters, Ms. Paylor bills her time at an hourly rate of $575; Mr. Ghom bills his time at an hourly rate of $420; and Ms. Young bills her time at an hourly rate of $375. Each attorney agreed to work at a reduced billable rate of $500, $300, and $300, respectively.

In 2024, this Court granted attorney fees of a Charleston-based partner's rate of $450 in a commercial transactions lawsuit, a lawsuit that this Court described as "not exceedingly complex". *Beaumont v. Branch*, No. 2:23-CV-03546-DCN, 2024 WL 3742755, at *12-*13 (D.S.C. Aug. 9, 2024) (noting that a case is complex where there are complicated procedural postures combined with many issues and complicated facts in the case, spread over a long period of time). Also recently, in the Middle District of Georgia, an FCA defendant's lawyers "negotiated an hourly rate of $415 for all lawyers, which [the lawyers said was] a significant reduction in its typical hourly rate" for such matters. *United States ex re. Zediker v. OrthoGeorgia*, 407 F. Supp. 1330, 1343 (M.D. Ga. 2019) (noting that defendant's lead counsel's "hourly rate is $520, and other Atlanta

and Savannah partners involved in this matter charge rates between $620 and $625"). Approximately fifteen years ago, the Fourth Circuit affirmed an award of attorney fees to the prevailing defendant in an FCA action at the hourly rate of $310. *Vuyyuru*, 555 F.3d at 357.

6. <u>Expectations at the outset of the litigation and time limitations imposed.</u>

Defendants were hopeful that the Court would grant their motion to dismiss. When the Court denied the motion, Defendants had no option but to engage vigorously in discovery practice so as to develop the facts necessary to support all available defenses within the timelines provided in the Court's scheduling orders.

7. <u>Amount in controversy and results obtained.</u>

This case was never about money—indeed, Mr. Austin was a *volunteer* member of the Board of Trustees. This case was about punishment. And the school's reputation, along with the reputation of the individual Defendants and the members of the Board, hung in the balance. Undersigned counsel obtained a favorable result for their clients at the summary judgment stage and again on appeal. This result not only avoided an expensive, time consuming, and likely very unpleasant trial, it vindicated Defendants within their community and within the local community. This, for Defendants, is priceless.

8. <u>Experience, reputation, and ability of attorneys.</u>

Ms. Paylor is a shareholder with Saxton & Stump. She has over four decades of experience representing businesses, governmental entities, and individuals in complex civil litigation. She was president of the South Carolina Bar from 2013-2014 and, in 2021, she was inducted to the American College of Trial Lawyers as a Fellow.

Mr. Ghom was a senior counsel with Saxton & Stump at the beginning of this lawsuit and has since become a shareholder who focuses his practice on commercial litigation and business

and corporate law. He graduated from Charleston School of Law and earned a master's degree in business administration from the College of Charleston. He has over eight years of experience as an attorney and has consistently been recognized by Best Lawyers as one of South Carolina's "Ones to Watch" in Commercial Litigation and Corporate Law. Mr. Ghom has also been recognized as a Super Lawyers Rising Star every year since 2021.

Ms. Young is a senior counsel with Saxton & Stump who, prior to joining the law firm, spent most of her professional career as a federal law clerk, during which time she routinely assisted with complex civil litigation, including FCA matters. She graduated from the University of South Carolina School of Law in 2009 and has over seventeen years of experience as an attorney.

9. Nature and length of the professional relationship between attorney and client.

CDS had never faced litigation such as this. The Chairman of the Board at the time of these events in 2022 reached out to Ms. Paylor and asked her to represent CDS regarding the problems with the Austins at the school. Although she had previously been engaged by CDS on a specific and unrelated non-litigation matter, this was the first time CDS retained her to represent it in a significant litigation matter.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Court GRANT its Renewed Motion for Costs and Attorneys' Fees.

[signature to follow]

By: */s/ Bijan K. Ghom*
Alice F. Paylor, District Court # 4017
Bijan K. Ghom, District Court # 12918
Saxton & Stump, LLC
151 Meeting Street, Suite 400
Charleston, SC 29401
(843) 414-5080
afp@saxtonstump.com
bkg@saxtonstump.com

ATTORNEYS FOR DEFENDANTS

November 17, 2026